**ESTATE OF SCHMIDT et al., Appellees,**

v.

**DERENIA et al., Appellants.**

[Cite as *Estate of Schmidt v. Derenia,* 158 Ohio App.3d 738, 2004-Ohio-5431.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 03AP–335 and 03AP–493.

Decided Oct. 12, 2004.

</div>

Cooper & Elliott, Charles H. Cooper, Rex H. Elliott, and Aaron D. Epstein, for appellees.

Wiles, Boyle, Burkholder & Bringardner Co., L.P.A., and Michael L. Close; Kohnen & Patton L.L.P., Joseph L. Dilts and Jeffrey M. Hines; David L. Day, for appellants.

WRIGHT, Judge.

{¶ 1} Defendants-appellants, Sharon K. Derenia and J.B. Hunt Transport Services, Inc. ("J.B. Hunt"), appeal from a judgment of the Franklin County Court of Common Pleas pursuant to a jury verdict in favor of plaintiffs-appellees, the estate of Warren J. "Joe" Schmidt and Melissa Schmidt. Appellants have also appealed from a subsequent judgment entered by the trial court adjudicating posttrial motions and awarding attorney fees and prejudgment interest to appellees. This court has consolidated the two appeals.

{¶ 2} This case resulted from a fatal motorcycle accident caused by leaking diesel fuel. On August 4, 2001, appellant Derenia, acting within the course and scope of her employment as a semi-truck driver for J.B. Hunt, was transporting

freight from Lima, Ohio, to a railroad yard in Grove City, Ohio. While traveling west on Interstate 70 in Columbus and approaching the interchange with Interstate 71, Derenia struck debris on the road that punctured her fuel tank, causing diesel fuel to leak onto the highway. After traveling for some distance and time, the exact duration of which was the subject of some dispute at trial, Derenia negotiated the right-hand exit from Interstate 70 east onto Interstate 71 south, and brought her truck to a stop near the bottom of a curving downgrade ramp. Approximately nine minutes thereafter, Joe Schmidt, who was riding a motorcycle and followed by his wife on her own motorcycle, rode onto the ramp, slid on the spilled diesel fuel, and crashed into the guardrail, causing his death.

{¶ 3} On September 13, 2001, appellees filed suit against Derenia personally and against J.B. Hunt under a respondeat superior theory of employer liability. After amendment, the complaint asserted claims for wrongful death and negligent infliction of emotional distress but did not explicitly seek an award of punitive damages on either claim. As the trial date approached, counsel for appellees indicated in a pretrial statement and a settlement demand letter, dated August 29 and September 3, 2002, respectively, that both compensatory and punitive damages would be sought. Appellants responded with a motion in limine on September 9, 2002, to prohibit any punitive-damages claims by appellees, arguing that appellees' complaint, in addition to containing no explicit mention of punitive damages, did not allege conduct supporting such an award. A trial began September 16, 2002, at which time the trial court deferred ruling on the motion in limine.

{¶ 4} The trial covered 12 days and included numerous witnesses and much evidence. After appellees rested, they made an oral motion to amend their pleadings to include a claim for punitive damages, which the trial court granted. After both sides rested, the court overruled a motion by appellants for a directed verdict on the issue of punitive damages and instructed the jury accordingly. On October 2, 2002, the jury returned a verdict in favor of appellees, which included awards of $69,000 for Melissa Schmidt's negligent-infliction-of-emotional-distress claim, $1,449,000 for the wrongful-death claim, and $5,500,000 for the punitive-damages claim. The jury also indicated that an award of attorney fees was warranted.

{¶ 5} Pursuant to the jury verdict, the trial court entered judgment against appellants jointly on October 22, 2002. Appellants then filed motions for judgment notwithstanding the verdict, for a new trial, and to vacate the judgment, and appellees filed a motion for prejudgment interest. On March 11, 2003, the trial court issued a decision denying appellants' motion for new trial and motion for judgment notwithstanding the verdict. However, the trial court granted the motion to vacate, finding that the damages judgment should not have been

entered against appellants jointly. The trial court entered an amended judgment against Derenia primarily and J.B. Hunt secondarily. On March 14, 2003, the trial court held an evidentiary hearing on appellees' motion for prejudgment interest and attorney fees. On April 28, 2003, the trial court entered a decision and entry awarding attorney fees of $365,724.71 and prejudgment interest to appellees.

{¶ 6} Appellants have separately appealed from the two judgments of the trial court, and this court has consolidated the appeals. Appellants originally asserted eight assignments of error but subsequently dismissed all but the first three:

**Assignment of Error No. 1:** The trial court committed prejudicial error in permitting the issue of punitive damages to be included in the trial.

A. The trial [court] committed error prejudicial to the appellants in allowing the appellee to pursue an unpled claim for punitive damages.

B. There was insufficient evidence of conduct justifying the imposition of punitive damages; accordingly, the trial court erred in failing to grant the motions of the appellants for a directed verdict at the close of the appellee's case-in-chief, at the close of all evidence and in the appellants' motion for judgment notwithstanding the verdict.

C. The trial court erred to the prejudice of the appellants in the content of its jury instructions on punitive damages.

**Assignment of Error No. 2:** The award of punitive damages in the amount of $5,500,000 where full compensatory damages were calculated to be $69,000 is excessive and violates the due process clause of the Fourteenth Amendment to the Constitution of the United States.

**Assignment of Error No. 3:** The trial court erred to the prejudice of the appellants when it granted appellee's motion for attorney fees.

A. Due to the fact that punitive damages were inappropriate under the facts of this case, so too was the award of attorney fees.

B. Assuming that attorney fees were warranted, the amount of the trial court's award was excessive and manifestly unjust in light of the evidence adduced in support thereof.

{¶ 7} The arguments in appellants' first assignment of error relating to the trial court's failure to grant appellants' motions for directed verdict and for judgment notwithstanding the verdict on the punitive damages issue are dispositive of this appeal and will be addressed first.

{¶ 8} Appellants assert that the trial court erred in permitting the issue of punitive damages to be considered by the jury because there was insufficient evidence of conduct on the part of appellants that would justify the imposition of punitive damages. Appellants accordingly argue that they were entitled either to

a directed verdict or judgment notwithstanding the verdict on the issue of punitive damages.

{¶ 9} A motion for directed verdict should be granted where the movant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the nonmoving party. *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 172, 539 N.E.2d 1114. The motion must be denied when reasonable minds could reach differing conclusions on that evidence. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467. Denial of a motion for judgment notwithstanding the verdict is reviewed under the same standard. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 693 N.E.2d 271.

{¶ 10} Under Ohio law, an award of punitive damages in a tort case may be made only upon a finding of actual malice, fraud, oppression, or insult on the part of the defendant. R.C. 2315.21; *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 473, 575 N.E.2d 416; *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281, 316, 736 N.E.2d 517. Because fraud, oppression, or insult is not alleged in the present case, it is the presence of actual malice that is at issue. The Supreme Court has defined actual malice for purposes of punitive damages as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis sic.) *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus. "[S]omething more than mere negligence is always required." Id. at 335, 512 N.E.2d 1174, citing *Leichtamer v. Am. Motors Corp.* (1981), 67 Ohio St.2d 456, 472, 21 O.O.3d 285, 424 N.E.2d 568.

{¶ 11} In the present case, since there is no assertion that Derenia's conduct could be characterized as motivated by hatred, ill will, or a spirit of revenge, it is the second form of malice defined by the syllabus law of *Preston* that is at issue: whether Derenia's actions demonstrated a conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm. When proceeding on the "conscious disregard" definition of malice under *Preston,* a punitive-damages claim requires proof of the defendant's subjective knowledge of the danger posed to another by his conduct. *Malone v. Courtyard by Marriott L.P.* (1996), 74 Ohio St.3d 440, 659 N.E.2d 1242, syllabus. "Since punitive damages are assessed for punishment and not compensation, a positive element of conscious wrongdoing is always required. This element has been termed conscious, deliberate or intentional. It requires the party to possess knowledge of the harm that might be caused by his behavior." *Preston,* 32 Ohio St.3d at 335, 512 N.E.2d 1174. "[A]ctual malice requires consciousness of the near certainty (or otherwise stated 'great probability') that substantial harm will

be caused by the tortious behavior. Any less callous mental state is insufficient to incur that level of societal outrage necessary to justify an award of punitive damages. Therefore, it is evident that a reckless actor, who only has knowledge of the mere possibility that his or her actions may result in substantial harm, is not behaving maliciously." *Motorists Mut. Ins. Co. v. Said* (1992), 63 Ohio St.3d 690, 698, 590 N.E.2d 1228, citing *Preston,* 32 Ohio St.3d at 336, 512 N.E.2d 1174, and Prosser & Keeton, The Law of Torts (5th Ed.1984) 212–214, Section 34, overruled in part on other grounds, *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397. The defendant's motive for the tortious conduct is relevant in assessing the existence of actual malice: "[T]here is evidence upon which the jury could reasonably find that defendant acted with a motive to injure plaintiffs, sufficient to constitute actual malice for purposes of determining punitive damages." *Walsh v. Starck Van Lines* (Sept. 29, 1981), Franklin App. No. 81AP–102, 1981 WL 3489.

{¶ 12} Moreover, a party seeking punitive damages must meet the heightened burden of proving entitlement to them by clear and convincing evidence. R.C. 2315.21(C). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

{¶ 13} We will examine the evidence in the case to determine whether, viewed in a light most favorable to appellees, it was sufficient to allow the issue of punitive damages to go to the jury under the standard set forth above. The parties have been unable to provide any Ohio cases decided on similar facts, nor has our research disclosed any to specifically guide us in our determination. Several foreign-state cases, notably *Perez Librado v. M.S. Carriers, Inc.* (N.D.Tex.2004), Civ. A. 3:02–CV–2095–D (slip opinion) and *Medlin v. Clyde Sparks Wrecker Service, Inc.* (C.A.6, 2003), 59 Fed.Appx. 770, while marginally instructive, are decided under a different punitive-damages standard or otherwise distinguishable.

{¶ 14} Derenia testified at trial that when she first saw the debris in the road, apparently a heavy steel bar serving as a truck mudflap holder, she was in the right-hand lane with a paved berm to her right. Traffic was light but she had cars to her left and semi-trucks traveling ahead of her in her lane. The truck immediately ahead of her did not swerve to avoid the debris, so she had no warning of it until it appeared in view after this truck passed over it. She attempted to swerve slightly, without changing lanes, to avoid the debris but

could not avoid running over it; she then heard a dragging noise under her truck that continued for 15 to 30 seconds. She immediately turned on her emergency flashers and soon noticed handling problems leading her to believe that she had damaged or punctured a "steer" tire. She did not immediately apply her brakes because of concern that the truck would roll if the steer tire was flat, and she slowed by downshifting instead. She continued driving for a short distance and ultimately pulled over toward the bottom of the curved Interstate 71 south ramp. After she had stopped her truck on the ramp, she became aware for the first time that other truckers were reporting on the CB radios that her truck was leaking fuel. She inquired of other truckers on the radio how to plug the leak and was told to stuff a rag into the fuel tank puncture. She then descended from her truck and attempted to do so. She saw that there was heavy accumulation of fuel on the freeway ramp and was aware that it would render the ramp slippery. She continued to try to stop the leak, and after approximately nine minutes, she observed Warren Schmidt crash his motorcycle after sliding on the fuel. Derenia then got on the CB emergency channel to ask for help and contacted J.B. Hunt using her on-dash computer ("ODC"). She did not specifically recall asking anyone on the CB radio to contact police and have the ramp closed to traffic. She did not leave her truck and attempt to set any kind of flare or warning triangles at the top of the ramp to warn oncoming motorists of the slippery condition, either before or after the motorcycle wreck.

{¶ 15} Another truck driver for J.B. Hunt, James Brown, testified that he was driving the same route as Derenia from Lima to Columbus on the day in question and was a few miles ahead of Derenia at the time of the accident. Derenia contacted him on his CB and told him that she thought she had struck debris and cut her tire. When Brown asked whether it was a steer tire or drive tire, she did not respond. Brown then heard another driver speak for approximately one minute commenting that a J.B. Hunt truck was leaking diesel fuel and how expensive the cleanup would be for J.B. Hunt. Brown assumed that the truck involved was Derenia's. He then heard Derenia on the CB radio ask whether anyone knew how to plug a fuel leak.

{¶ 16} Columbus Police Detective James A. Rease testified that another officer had reported that the diesel leak stretched for at least 4,737 feet on the freeway and was from one to two feet wide some two hours after the accident, when passing cars would likely have spread the fuel. Columbus Police Officer Dredrick Lane testified that he observed damage to the tire and fuel tank so substantial that he wondered why Derenia did not immediately stop and check for damage.

{¶ 17} Columbus Police Officer Kim C. Edley testified that the fuel leak covered nearly the entire width of the freeway ramp. Several motorists testified

that they lost control of their vehicles, even when attempting to negotiate the ramp at very reduced speed and that this occurred within view of Derenia.

{¶ 18} Derenia's testimony that she was unaware she was leaking fuel until she pulled over was contradicted by Sergeant Mark A. Malcolm of the Ohio Highway Patrol, who testified that he spoke with Derenia at the scene of the accident and she told him that other drivers had informed her that she was "leaking something" while she was still driving. When Sergeant Malcolm asked Derenia why she did not immediately pull over, she replied that she was looking for a safe place to stop.

{¶ 19} Robert Reed, appellees' trucking expert, testified that after Derenia knew she had run over the mud flap hanger and realized she had a problem with her steer tire, she should have immediately pulled to the side of the road and examined the truck. He said she should have slowed down by taking her foot off the accelerator and downshifting. He testified that drivers are trained in the Commercial Drivers License manual ("CDL") to get off the road as quickly as possible after striking something. Reed opined that there was no reason why Derenia should not have immediately pulled into the breakdown lane after knowing that she had struck the object and immediately realizing that her vehicle had a problem. He stated that there was plenty of space in the breakdown lane for her to pull over and safely exit the vehicle to inspect it and that the area had an adequate line of sight to warn oncoming motorists. He also opined that the breakdown lane had enough room to allow somebody to perform service on the vehicle.

{¶ 20} Walter Guntharp, appellants' trucking expert, testified that after hitting the object and hearing the scraping sound, it was reasonable for Derenia to put on her caution flashers and begin to slow down to try to find some place to pull over. He said the worst thing a truck driver can do in those situations is to use the brakes, and the best thing to do is step on the accelerator for a moment and then gradually let the truck decelerate. He testified that to slow down under those circumstances, a truck driver should gradually downshift, and assuming the truck was traveling at 55 m.p.h., it would travel approximately 4,700 feet until it could stop. Guntharp further testified that Derenia should not have stopped her truck in the breakdown lane because that would have required braking, and the breakdown lane is an unsafe area to park a truck. He stated that it is immaterial when she actually knew about the leak because it still would have taken the same amount of time and distance to slow the truck, and if she had stopped earlier, the fuel streak and the parked truck in the breakdown lane would have created an even bigger hazard. He opined that Derenia's actions in pulling over on the ramp were reasonable and constituted the safest option, that Derenia's actions in first attempting to plug the leak were reasonable, and that using reflective

triangles would not have effectively warned motorists turning onto the ramp because the triangles would not have specifically indicated the slippery substance on the roadway.

{¶ 21} However, Guntharp admitted on cross-examination that during the 15 to 30 seconds that Derenia dragged the metal and was not aware of her steering-tire problem, there was nothing prohibiting her from braking. He opined that the air leak in the tire was not a total blowout and that the tire did not begin to fail until she perceived the problem. He "frankly" admitted on further redirect examination that if the tire had not gone flat, hitting the brakes would not have represented a substantial hazard. He also admitted that Derenia could have requested help on her ODC and CB, but that drivers are taught to control the situation first. He further admitted that the CDL manual says the first thing a driver should do at an accident scene is to keep another accident from happening and then put out a call over the emergency channel before exiting the truck.

{¶ 22} Construing this evidence in a light most favorable to appellees, the following conduct by Derenia must be assessed to determine whether it rises to the level of actual malice: (1) Derenia failed to take more prompt or effective evasive action to avoid running over visible debris in the road, despite the open berm flanking her truck; (2) Derenia failed to promptly apply her brakes and pull to the paved berm during the interval between striking the debris, hearing a dragging noise beneath her truck, and perhaps 30 seconds later realizing that her truck was handling poorly and her steer tire may have punctured; (3) Derenia continued for perhaps another 30 seconds past the point at which she could have pulled over on in a straight, level, and wide paved berm and instead chose to continue between one-quarter and one-half mile, leaking diesel fuel and finally stopping at the bottom of a curved and narrow ramp; (4) Derenia did not immediately and effectively use the means at her disposal, her CB radio, to alert as many drivers as possible of the slippery ramp condition and possibly have the police promptly close the ramp to traffic; and (5) Derenia never left the side of her vehicle to travel to the top of the ramp and post warning signs to prevent, during the nine minutes between the time she brought her truck to a stop and the time appellees' decedent slipped and crashed, an accident from occurring despite the great likelihood that an accident would occur.

{¶ 23} We must bear in mind that the question before us is not whether Derenia's actions constituted clear-cut negligence, which was the proximate cause of the decedent's death. Rather, to support the punitive damages, we examine her conduct to determine whether it constituted more than mere negligence and contained "a positive element of conscious wrongdoing," *Preston*, 32 Ohio St.3d at 335, 512 N.E.2d 1174, and contained a knowledge of substantial harm that reflects

"the element of outrage required to find actual malice." id. at 336, 512 N.E.2d 1174. We find that as a matter of law, it does not. See *Said*, supra.

{¶ 24} Accepting the least favorable assessment of Derenia's actions, the jury could clearly conclude that she made a series of errors that directly led to the decedent's death. Derenia could have more effectively taken prompt, and perhaps more abrupt, evasive action to avoid the debris in the road; she could have immediately applied her brakes and pulled over to the side of the road upon hearing a dragging noise, rather than waiting until her punctured steer tire made this impossible; she could have immediately reacted to the information provided by other truckers that she was leaking fuel, and again pulled more quickly to the side of the road; she could have immediately used her CB radio to attempt to contact authorities and have the ramp closed; and finally, she could, upon exiting her truck, have immediately proceeded to the top of the ramp and set reflective markers or flares to warn other drivers. Some of this conduct no doubt cumulatively amounted to negligence of a high order, and the outcome was certainly tragic.

{¶ 25} However, to determine whether her subjective mental state supports an evaluation of her conduct and motives that justifies a finding of actual malice, one must also consider what Derenia *did* do during this interval. She did *not* continue indefinitely on her way to her destination with a complete disregard for the fuel leak and possible other damage to her truck; she did not sit idly in her truck cab after pulling over, but, during the period she might have taken to walk to the top of the ramp to set warning signals, instead chose to continue to attempt to plug the fuel leak on her truck with a rag and some paper towels. She contacted other truckers for advice on the CB, and while she seemed primarily to receive answers that caused her to become preoccupied with stanching the fuel leak—essentially locking the barn door behind the horses—she was nonetheless not motivated by a complete disregard for the safety of others in following that advice. While these actions may have constituted poor choices, they do not contain any "positive element of conscious wrongdoing," *Preston*, 32 Ohio St.3d at 335, 512 N.E.2d 1174, nor is it likely that an award of punitive damages would serve to deter similar conduct from others who might under the same circumstances similarly lose sight, in all good faith, of the best course of action and thereby commit negligence warranting liability for compensatory damages. On these facts, we find that reasonable minds could not have found that Derenia was so callous in her disregard for the rights and safety of others that society would deem it intolerable, and the issue of punitive damages should therefore not have gone to the jury. The second section of appellants' first assignment of error accordingly has merit and is sustained.

{¶ 26} Elsewhere under appellants' first assignment of error, appellants argue that the trial court erred in allowing appellees to pursue the claim for punitive damages that had not been pled in the complaint. Appellants also argue under this assignment of error that the trial court erred in the content of its jury instructions on punitive damages. Our disposition with respect to the question of whether punitive damages should have gone to the jury at all renders both issues moot.

{¶ 27} Appellants' second assignment of error argues that the award of punitive damages is excessive in amount and exceeds the guideposts set forth by the United States Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003), 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, and *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809. This issue is also rendered moot by our disposition of appellants' first assignment of error.

{¶ 28} Appellants' third assignment of error asserts that the trial court erred in awarding attorney fees in the case. Because the trial court's award is based entirely upon the award of punitive damages, our reversal of the award of punitive damages award also warrants reversal of the award of attorney fees. Appellants' third assignment of error is sustained.

{¶ 29} In summary, we find that the trial court erred in overruling appellants' motion for directed verdict on the punitive damages claim and subsequently in overruling appellants' motion for judgment notwithstanding the verdict once the jury had awarded punitive damages. Appellants' first assignment of error is sustained to this extent, and other arguments brought by appellants under this assignment of error are rendered moot. Appellants' second assignment of error is rendered moot in its entirety. Appellants' third assignment of error is sustained, and the judgment of the trial court awarding attorney fees is reversed. We leave undisturbed all other aspects of the trial court's judgment, and the matter is remanded to the trial court for further proceedings in accordance with law and this opinion.

<div style="text-align:right">

Judgments affirmed in part
and reversed in part,
and cause remanded.

</div>

PEGGY BRYANT, J., concurs.

BROWN, J., dissents.

WRIGHT, J., retired, of the Ohio Supreme Court, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.

BROWN, Judge, dissenting.

{¶ 30} Being unable to concur with the majority's determination that there was insufficient evidence to allow the jury to consider the issue of punitive damages, I respectfully dissent. Before submitting the issue of punitive damages to the jury, the trial court was required to determine whether reasonable minds could differ as to whether Derenia was aware that her actions had a great probability of causing substantial harm, and that there was sufficient evidence that she consciously disregarded the safety of others. *Preston v. Murty* (1987), 32 Ohio St.3d 334, 336, 512 N.E.2d 1174. Viewing the record in a light most favorable to appellees, I believe there was sufficient (albeit conflicting) evidence that Derenia's decision to continue driving, when faced with knowledge of a dangerous situation, and her subsequent actions and inactions in addressing the danger exhibited a conscious disregard for the safety of others. The court instructed the jury as to the issue of whether Derenia's acts or failure to act demonstrated a conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm (and, in fact, the jury ultimately found actual malice). I conclude that the trial court did not err in permitting the jury to consider the issue of punitive damages because reasonable minds could differ as to whether Derenia's conduct constituted malice, and I therefore disagree with the majority's determination that the issue of punitive damages should not have gone to the jury.