*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHICAGO TITLE INSURANCE CORPORATION, a
Missouri Corporation,

*Plaintiff-Appellee,*

              No. 05-4411

*v.*

JAMES A. MAGNUSON; FIRST AMERICAN TITLE
INSURANCE COMPANY, c/o Timothy P. Sullivan,
Registered Agent,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 03-00368—Gregory L. Frost, District Judge.

Argued: November 28, 2006

Decided and Filed: May 21, 2007

Before: DAUGHTREY, GIBBONS, Circuit Judges; EDMUNDS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Matthew A. Kairis, JONES DAY, Columbus, Ohio, for Appellants. Andrew S. Pollis, HAHN LOESER & PARKS LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Matthew A. Kairis, Chad A. Readler, G. Roger King, JONES DAY, Columbus, Ohio, Robert P. Ducatman, JONES DAY, Cleveland, Ohio, for Appellants. Andrew S. Pollis, Steven A. Goldfarb, HAHN LOESER & PARKS LLP, Cleveland, Ohio, for Appellee.

---

## OPINION

---

    EDMUNDS, District Judge. The numerous questions presented in this appeal concern a covenant not to compete and the resulting jury verdict awarding compensatory and punitive damages to Plaintiff-Appellee Chicago Title Insurance Corporation ("Chicago Title") for Defendant-Appellant James Magnuson's breach of the agreement and Defendant-Appellant First American Title Insurance Company's ("First American's") tortious interference with this agreement. On

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

January 25, 2005, a jury found Magnuson and First American liable for breaching the covenant and for tortious interference and awarded compensatory and punitive damages totaling over $43 million. The district court denied several post-trial motions and upheld the verdict in its entirety. For the reasons discussed below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** this case to the district court for a new trial on compensatory damages consistent with this opinion.

## I.

Chicago Title and First American are competitors in the title insurance industry, and Magnuson is an individual with many years of experience in a variety of positions for companies in this industry. Magnuson formed a title insurance agency in central Ohio in 1978 along with a partner, James Steller. Magnuson and Steller built the business and brought on additional partners until 1991, when the partners sold the business to Chicago Title for $5.5 million.

In conjunction with the sale, and in an effort to protect the goodwill of the business that Chicago Title purchased, Magnuson entered into an employment contract (the "Contract") on July 1, 1991, that included a covenant not to compete (the "Covenant") as one of its provisions. Specifically, the Contract obligated Magnuson to work for Chicago Title for five years after the sale, and the Covenant prohibited him from acting in any capacity for a title insurance company in a seven-county area surrounding, and including, Columbus, Ohio "[f]or a period of five years after the term of this Agreement." Steller also took a position with Chicago Title following the sale, but he left the Ohio market in 1993.

At the time Steller left Chicago Title's employ, Magnuson and Chicago Title amended the Contract to state that the initial five-year term of employment would extend for ten-and-a-half years, until December 31, 2001. According to the modification, "[a]ny other reference to word (sic) 'term' in the Contract and the Exhibits thereto shall be construed as being the said ten and one half year period." Therefore, the five-year non-compete period did not begin until the term of the agreement ended, and contractual expiration of the non-compete period was delayed until the end of 2006.

Throughout his employment with Chicago Title, Magnuson advanced through a variety of management positions, each with an increasing scope of geographic coverage. In 1996, Magnuson became Chicago Title's Ohio Manager, where he supervised offices in Cincinnati, Dayton, Cleveland and Akron. He turned over direct management of the Columbus office to other Chicago Title managers at that time. In 1998 or 1999, Magnuson assumed responsibility over Ohio, Indiana, Michigan and Pennsylvania as Chicago Title's Regional Manager. Finally, in 2001, Magnuson became Regional Manager for all title insurance brands of Chicago Title's parent, Fidelity. In this position, his territory covered Ohio, Pennsylvania, New Jersey, Delaware, Maryland, Virginia and West Virginia.

Once the Contract term expired on its own terms at the end of 2001, Magnuson and Chicago Title discussed a two-year employment agreement containing a one-year post-employment non-compete clause, but they never executed any documents related to an extension of the Contract. In August 2002, Magnuson was appointed Division Vice President of another one of Fidelity's title insurance brands and no longer worked for Chicago Title.

Also in 2002, The Talon Group ("Talon"), a division of First American, embarked on an expansion strategy that included recruiting experienced individuals from industry competitors. Attracting employees who possessed established relationships with customers and employees was critical to generating business growth, as the title insurance business is highly competitive with minimal product differentiation among competitors. As part of this effort, First American convinced Magnuson to leave Chicago Title and join Talon. During the negotiation process, Magnuson made Talon aware of the existence of his non-compete agreement with Chicago Title, and First American

agreed to indemnify Magnuson for any liability he might incur as a result of making the move. Shortly thereafter, Steller also joined First American.

Once with First American, Magnuson was based out of an office located in Columbus, and the company began recruiting other key Chicago Title customers and employees from central Ohio. Within the first three months, thirty Chicago Title employees switched to First American, and a significant number of Chicago Title's customers in the area also ended up moving over.

The district court below granted Chicago Title's motions for summary judgment as to liability on its breach of contract claim against Magnuson and its tortious interference claim against First American before submitting the case to the jury on the issue of damages. The jury returned a verdict of $10.8 million in compensatory damages and $32.4 million in punitive damages, and the district court denied various motions for a new trial by Magnuson and First American, leading to the instant appeal.

Magnuson and First American challenge the following rulings of the district court: (1) finding that the Covenant was reasonable and therefore enforceable, (2) granting summary judgment for Chicago Title on the issue that Magnuson breached the Covenant, (3) granting summary judgment for Chicago Title on the issue that First American's actions constituted tortious interference, (4) granting judgment as a matter of law on the issue that Chicago Title was a lost volume seller, (5) instructing the jury that the Covenant was reasonable for the full five-year period, (6) finding that punitive damages were appropriate for the jury to consider, (7) not remitting the jury's punitive damages award as unconstitutionally large in relation to the amount of compensatory damages awarded, (8) failing to order a new trial on punitive damages, and (9) giving improper jury instructions that tainted the jury's verdict.

Magnuson and First American filed a timely appeal. We have appellate jurisdiction under 28 U.S.C. § 1291.

## II.

### A. Reasonableness of the Covenant

An appellate court reviews "the district court's conclusions of law de novo and its findings of fact for clear error. Questions of contract interpretation are generally considered questions of law subject to de novo review." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996) (internal citations omitted). Here, the district court's decision involved a question of law, as it required a determination of whether the Covenant was reasonable under the circumstances and was therefore enforceable. Furthermore, under Ohio law, which the parties have chosen to govern the Contract, a non-compete clause's enforceability is a matter of law for the court. *UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 770 N.E.2d 1068, 1078 (Ohio Ct. App. 2001). Thus, we review the district court's ruling on the Covenant's reasonableness *de novo*, but accept the district court's findings of fact unless they were clearly erroneous.

### 1. The Covenant period at issue

Although the Covenant is contained in a single document that was extended by amendment on one occasion, there are actually two separate covenant periods at issue here between the parties. At the time of the 1991 sale, Chicago Title and Magnuson agreed that Magnuson would be employed for five years, after which time the five-year non-compete period would begin. Since the Contract was entered into at the same time Magnuson sold the business and mentions the acquisition itself, the original covenant is properly viewed as incident to the sale and not as an employment-related covenant.

At the time of the 1993 amendment, the amendment's provisions explicitly provided that the post-employment covenant period remained in effect and would begin at the end of Magnuson's employment term, as extended by the amendment to December 31, 2001. The amendment's sole focus, however, was on extending the period of Magnuson's employment with Chicago Title, and not the sale that occurred two years prior. The Covenant was no longer tied to the original ten-year period of protection contemplated when Magnuson sold his business to Chicago Title, as nothing in the amendment mentions the sale. Thus, the two covenants are: (1) a sale-related covenant not to compete for five years, beginning on July 1, 1996, and ending June 30, 2001, and (2) an employment-related covenant not to compete for five years (the one referred to as the "Covenant"), beginning on January 1, 2002, and ending on December 31, 2006.[1]

### 2. The Covenant is reasonable for at least two years

Under Ohio law, "[i]n determining the validity of a covenant or agreement in restraint of trade, each case must be decided on its own facts. . . . A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is [1.] no greater than is required for the protection of the employer, [2.] does not impose undue hardship on the employee, and [3.] is not injurious to the public. Courts are empowered to modify or amend employment agreements to achieve such [reasonable] results."[2] *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975). The party seeking to enforce the covenant "is required to adduce clear and convincing evidence as to each of these factors" in order to prove that the covenant is reasonable.[3] *Levine v. Beckman*, 548 N.E.2d 267, 270 (Ohio Ct. App. 1988). "'Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Estate of Schmidt v. Derenia*, 822 N.E.2d 401, 405 (Ohio Ct. App. 2004) (quoting *Cross v. Ledford*, 120 N.E.2d 118, 119 (Ohio 1954)).

Additional considerations that courts should assess in reviewing the reasonableness of a covenant include:

> whether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is disproportionate to the employee's detriment, whether

---

[1]The first period is not in dispute, as Chicago Title contends that Magnuson's breach occurred when he accepted the new position with First American in December 2002, after the expiration of the initial covenant period tied to the sale of his business. As a result, the cases that Chicago Title cites from other jurisdictions distinguishing between covenants not to compete arising under a sale of business and those from standard employment contracts are inapplicable here.

[2]Magnuson limits his challenge to the first prong of this test, and does not address any hardship on himself or public injury.

[3]Chicago Title cites a number of cases for its assertion that the proper burden of proof on this issue is a preponderance of the evidence. This position results from a failure to recognize that the clear and convincing standard required for an injunction to issue and the preponderance of the evidence standard that must be met to obtain monetary damages are the requisite burdens of proof to obtain either of these legal *remedies*. Each of these is distinct from a plaintiff's initial burden to show that a covenant not to compete is reasonable by clear and convincing evidence in order for there to be a viable *claim* for breach of the covenant.

the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment.

*Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (quoting *Raimonde*, 325 N.E.2d at 547).

We need not determine whether the Covenant was valid for its full five-year term because Magnuson's actions that Chicago Title claims violated the Covenant occurred just over one year after his defined term of employment ended. So, as long as the Covenant was reasonable for at least two years, we must affirm the district court's decision to award summary judgment to Chicago Title on the issue of liability.

The district court below noted that Chicago Title's vice president and manager of Ohio, Michael Nolan, testified that the five-year duration was necessary in order to give Chicago Title "time to secure the relationships." While this is not particularly strong evidence on its own, the district court made findings of fact regarding the competitive nature of the title insurance industry and the "importance of relationships within the . . . industry." *See also Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 71 (2d Cir. 1999) (discussing the significance of strong customer relationships). Given this backdrop, and how quickly Magnuson was able to bring employees and customers over to First American after leaving Chicago Title, it appears reasonable for an employer to seek to restrict an employee from moving to a competitor and taking customers and other employees with them for two years following the employee's departure. This is especially true with an employee such as Magnuson, who was a "key figure in the central Ohio title insurance industry" and had "exposure to Chicago Title's inner workings in Ohio."

Magnuson argues that Chicago Title's failure to present evidence justifying the specific length of five years (as opposed to a one-year or two-year non-compete period), means that the Covenant is unreasonable. *See Economou v. Physicians Weight Loss Centers of Am.*, 756 F. Supp. 1024, 1034 (N.D. Ohio 1991) (finding a three-year covenant unreasonable without support for that particular length of time); *Cole Nat'l Corp. v. Koos*, No. 66760, 1994 WL 716522 at *3-4 (Ohio Ct. App. Dec. 22, 1994) (reaching the same result for a one-year covenant). Both of these cases are distinguishable, as the appellant-employers in *Cole* "wanted a longer period of time but [were] told by counsel that twelve months would be reasonable." *Cole*, 1994 WL 716522 at *3. The court continued, reasoning that the employers chose "a time period not because of what was necessary but because it was the longest they expected would be enforced." *Id.* Similarly, in *Economou*, the plaintiff produced "no relevant testimony" whatsoever on this point. 756 F. Supp. at 1034.

Magnuson asserts that a plaintiff must state specific reasons for a particular covenant length in order for the covenant to be found reasonable, but he does not cite any cases in support of this proposition. Even though the *Economou* court had no testimony before it as to whether the particular time period sought was reasonable, it still assessed a number of the other factors outlined in *Raimonde* before coming to its final conclusion that the covenant at bar in that case was not reasonable. This mode of reasoning refutes Magnuson's position that a failure to provide specific justification for a covenant's length automatically means that the covenant is unreasonable.

Based upon all of the facts found by the district court to justify the Covenant, we are satisfied that the Covenant is reasonable for at least two years even though Chicago Title's testimony did not provide justification for a specific time period.

### 3. Magnuson's remaining challenges are meritless

Magnuson also challenges several of the district court's factual grounds for finding that the Covenant was reasonable. First, he asserts that consideration of Chicago Title's desire to protect

its employee relationships was inappropriate because Chicago Title could have protected its interests through less restrictive means by entering into covenants with those employees directly. *Busch v. Premier Integrated Med. Assoc., Ltd.*, No. 19364, 2003 WL 22060392 at *6-7 (Ohio Ct. App. Sept. 5, 2003) (holding that a desire of "maintaining stability" was not sufficient to make a covenant not to compete reasonable in a medical practice setting). Here, however, Chicago Title was concerned with more than merely maintaining the stability of its workforce. The district court's opinion states that the relationships between a title company's principals and its employees are important in maintaining business and relationships with customers. As this item goes to the heart of a company's ability to compete in the marketplace, we do not find *Busch* applicable here, since a desire to be able to effectively compete is a stronger justification than a desire to retain stability among employees. Furthermore, we reject Magnuson's argument for extension of *Busch* to all cases, as nothing in *Busch* indicates that its holding was to be construed so broadly. Therefore, it was appropriate for the district court to consider this justification in assessing the Covenant's reasonableness.

Next, Magnuson argues that protecting Chicago Title's customer relationships was not a valid reason because he was not the "sole customer contact and not actively engaged in the market at issue." (Appellants' Br. at 29; citing *Economou*, 756 F. Supp. at 1034.) The district court found, however, that Magnuson, in fact, was "the key figure in the central Ohio title insurance industry, even if he was not the day-to-day point man with each customer." Magnuson challenges this finding by asserting his own view that he was not an important customer contact by this time. Such an argument is unavailing at this stage, since assessing the credibility of various witnesses was the district court's responsibility, and the district court's finding of fact on this point was not clearly erroneous. Therefore, this was also a valid factor to consider in the reasonableness inquiry.

Finally, Magnuson posits that protecting Chicago Title's trade secrets and confidential information is an insufficient reason to justify the Covenant on these facts because Chicago Title employees were not required to sign confidentiality agreements and the company's information systems were not password protected. Although this is Chicago Title's weakest justification for the Covenant's necessity, *Raimonde* lists the protection of trade secrets as only one item to consider in assessing reasonableness, so this potential deficiency is not dispositive of the issue.

Overall, because Chicago Title had critical customer and employee relationships to protect, because these relationships directly affected Chicago Title's ability to compete in the market, because Magnuson could influence the continuity of these relationships, because the Covenant contained appropriate geographic and temporal limits, because Magnuson had other means to support himself (i.e. his law degree), and because at least some of Magnuson's relationships were established or strengthened during his employment with Chicago Title,[4] we find that the district court properly concluded that the Covenant was reasonable for at least two years following Magnuson's departure from Chicago Title.

**B.      Grant of Summary Judgment to Chicago Title on the Contract Claim Against Magnuson**

---

[4]Magnuson is correct that courts have refused to enforce covenants not to compete in situations where an employee possessed skills that were developed prior to the employment with the party seeking enforcement. *See Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 968 (6th Cir. 2002); *Raimonde*, 325 N.E.2d at 547. Here, Magnuson had a wealth of experience in the title insurance industry prior to joining Chicago Title, which weighs against enforcement, but he also had ten years of employment with Chicago Title with which to strengthen his relationships with its customers, and this factor supports enforcement.

Magnuson next argues that the district court erred in granting summary judgment to Chicago Title on the issues of the Covenant's enforceability and Magnuson's breach. Specifically, he claims that (1) he presented sufficient evidence of a novation to avoid Chicago Title's motion for summary judgment, (2) the evidence, in fact, supported a grant of summary judgment to Magnuson on the issue of reasonableness, and (3) the court's decision prejudiced him at trial. Only the first and third arguments merit attention here, as we previously affirmed the district court's finding regarding reasonableness.

Appellate courts review a district court's grant of summary judgment *de novo*. *Leary v. Daeschner*, 349 F.3d 888, 896 (6th Cir. 2003). Summary judgment must be granted if "there is no genuine issue as to any material fact, and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Initially, the moving party has the burden of proving that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or on the failure of the nonmoving party to produce 'more than a mere scintilla of evidence' which would create a genuine dispute for the jury. In reviewing the district court's decision to grant summary judgment, we must view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party." *Leary*, 349 F.3d at 897 (internal citations omitted). The standard prohibits a court from making credibility determinations. *Arnett v. Myers*, 281 F.3d 552, 559 (6th Cir. 2002).

### 1. No genuine issue of fact existed regarding novation

Under Ohio law, "[a] contract of novation is created where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration." *McGlothin v. Huffman*, 640 N.E.2d 598, 601 (Ohio Ct. App. 1994). The party asserting a novation defense carries the burden of showing "evidence of clear intent to form a new contract . . . ." *Am. Vineyards Co., Inc. v. Wine Group*, 486 N.E.2d 854, 857 (Ohio Ct. App. 1984). The existence of a novation "will never be presumed." *Fitness Experience, Inc. v. TFC Fitness Equip.*, 355 F. Supp. 2d 877, 891 (N.D. Ohio 2004) (citing *Bolling v. Clevepak*, 484 N.E.2d 1367, 1379 (Ohio Ct. App. 1984)).

Despite Magnuson's citation of several items in the record that indicate the Contract may no longer have been in effect, none of these showed that the parties agreed on a *substitute* contract to replace the earlier one, so the district court did not err in finding that a novation did not occur here.

### 2. Evidence of Magnuson's recruiting activities was properly admitted at trial

Next, Magnuson alleges that the district court granted summary judgment on liability without specifically finding that Magnuson's recruitment of Chicago Title employees violated the Covenant. He cites no authority for his argument that the district court must have listed all possible ways that the covenant was breached in order for the jury to properly calculate damages. With language as broad as that in the Covenant prohibiting Magnuson from engaging in "any business . . . whether as owner, director, officer, investor, employee, or otherwise, which is in competition with the business of [Chicago Title] . . . in the [counties surrounding Columbus, Ohio]," a district court need not list all possible ways that the defendant might violate the covenant in order to properly grant summary judgment to the plaintiff on the issue of liability. In addition, such actions were properly considered on the issue of proximate cause for the damages that Chicago Title suffered as a result of Magnuson and First American's breach of contract. As a result, the argument on this point is without merit.

For the above reasons, we affirm the district court's grant of summary judgment to Chicago Title on the issue of Magnuson's liability for breach of contract.

**C.     Grant of Summary Judgment to Chicago Title on the Tortious Interference Claim Against First American**

The same *de novo* standard of review that applies to Magnuson's argument regarding the district court's grant of Chicago Title's motion for summary judgment on breach of contract liability governs the tortious interference issue. First American's arguments regarding the district court's grant of summary judgment to Chicago Title on the issue of whether First American tortiously interfered with Chicago Title's employment contract and the associated covenant with Magnuson are: (1) Chicago Title has not proven that a valid contract existed due to either (i) the Covenant being unenforceable, or (ii) the alleged novation, and (2) First American presented sufficient evidence on the issue of intent to defeat Chicago Title's motion for summary judgment. As noted above, the Covenant was enforceable for the relevant period and Magnuson failed to establish a novation as a matter of law, so First American's initial argument on this point is without merit.

Once the party moving for summary judgment has met its burden of raising sufficient facts to entitle its motion to be granted as a matter of law under Rule 56(c), the opposing party "has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). A district court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Furthermore, the Sixth Circuit "will not entertain on appeal factual recitations not presented to the district court" when reviewing a district court's decision. *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). "In reviewing summary judgment, we look at [the] record in the same fashion as the district court." *Id.* (quoting *Estate of Mills v. Trizec Prop.*, 965 F.2d 113, 115 (6th Cir. 1992)).

First American's appellate brief cites to numerous items from the record in an attempt to establish that disputed items of material fact existed regarding its intent to cause Magnuson to breach his covenant not to compete with Chicago Title. Under *Guarino*, however, our proper focus is on the factual evidence submitted below.

First American's sole assertion of fact regarding this tortious interference claim before the district court was that First American carved out and excluded the Columbus area from Magnuson's assigned territory. Chicago Title's undisputed evidence, however, showed that First American placed Magnuson in its Columbus office building, included him in a local title insurance industry directory, listed his cell phone number as the regional office number, placed an incoming local phone line on his desk, included his name on marketing materials, and had him participate in sales calls to Columbus-area clients. In the face of such evidence, the district court did not err in granting summary judgment to Chicago Title on the issue of liability for tortious interference because "no reasonable mind could conclude that . . . Talon did not intentionally induce Magnuson into breaching his contractual obligations" by placing him in the Columbus market despite the alleged exception of this territory from his responsibilities.

For the above reasons, we affirm the district court's grant of summary judgment to Chicago Title on the issue of First American's liability for tortious interference.

**D.  New Trial on Compensatory Damages**

Magnuson and First American argue for a new trial on compensatory damages because the district court erred by: (1) finding that Chicago Title was a lost volume seller as a matter of law, and (2) instructing the jury that the Covenant was enforceable for the full five-year period.

**1.  Chicago Title's duty to mitigate damages**

We review the district court's grant of a motion for judgment as a matter of law *de novo*. "The motion may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001).

In general, an aggrieved party has a duty to mitigate its damages arising out of a breach of contract under Ohio law. *Young v. Frank's Nursery & Crafts, Inc.*, 569 N.E.2d 1034, 1037 (Ohio 1991). One exception to this rule is a "lost volume seller" situation, where the aggrieved party could have made *both* (i) the sale that was lost due to the breach, as well as (ii) a second, subsequent sale. Under such a scenario, traditional contract damages would not fully compensate the damaged party for its losses because the second sale would likely mitigate nearly all of the party's lost profit damages from the first sale, thus depriving the party of its profit on the second sale. To ameliorate this unjust result, Ohio law allows a damaged lost volume seller to recover its lost profits from the breached sale in addition to traditional breach of contract damages. *Lake Erie Boat Sales, Inc. v. Johnson*, 463 N.E.2d 70, 73 (Ohio Ct. App. 1983) (citing Ohio Rev. Code § 1302.82(B) (2006), Ohio's version of § 2-708(2) of the Uniform Commercial Code prior to the 2003 amendments to Article 2). Although this case involves services rather than a sale of goods, the lost volume seller theory extends to service providers in a number of jurisdictions, and there is no indication that the Ohio Supreme Court would hold otherwise.[5] *See Evergreen Int'l Airlines, Inc. v. Asiana Airlines*, 136 F. App'x 95, 97 (9th Cir. 2005); *Gianetti v. Norwalk Hosp.*, 833 A.2d 891, 897 (Conn. 2003).

In order to qualify as a lost volume seller, Chicago Title must prove that it had access to sufficient supply to make both sales and that it would have completed the additional sale even if it made the first sale. *Tigg Corp. v. Dow Corning Corp.*, 962 F.2d 1119, 1130 (3d Cir. 1992). Below, First American attempted to present evidence that Chicago Title had to turn away business during 2002 because its existing employees were too busy and the company did not have physical capacity to hire additional employees. If believed, this evidence suggests that Chicago Title might not have been able to take on any additional business beyond that which it ended up losing to First American and, thus, was not a lost volume seller. The district court excluded this evidence, however, because it arose prior to the relevant damages period that began in March 2003 after Magnuson had influenced other employees and customers to leave Chicago Title.

"We review a district court's decision to exclude evidence for abuse of discretion. 'Under this standard, we will leave rulings about admissibility of evidence undisturbed unless we are left with the definite and firm conviction that the [district] court . . . improperly applie[d] the law or use[d] an erroneous legal standard." *U.S. v. Lucas*, 357 F.3d 599, 608 (6th Cir. 2004) (quoting *U.S. v. Bartholomew*, 310 F.3d 912, 920 (6th Cir. 2002) (internal quotations omitted)). Although this is a deferential standard, existing case law establishes that the district judge applied the law incorrectly by excluding evidence of Chicago Title's ability to take on new business prior to March 2003. While Chicago Title provides no cases holding that such evidence is improper to consider, numerous courts have recognized the propriety of allowing pre-breach evidence in making the determination of whether a party is a lost volume seller. *See R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 924 F.2d 709, 711 (7th Cir. 1991) (citing to evidence that the seller was "beating the bushes for all possible sales," "pursued 'every possible lead,' and attempted to 'identify every possible qualified customer' in 1984" prior to the 1985 breach); *Ullman-Briggs, Inc. v. Salton, Inc.*, 754 F. Supp. 1003, 1009 (S.D.N.Y. 1991) (considering evidence of the seller's business with the defendant prior to the breach). Where, as here, a party is seeking to dispute the other side's claim that it is a lost volume

---

[5]Furthermore, Magnuson and First American do not dispute that Chicago Title could be considered a lost volume seller even though it provides only services and not goods.

seller, evidence of the seller's business practices within a year of the breach is relevant and should have been admitted.

In addition, Magnuson and First American should also be able to present evidence of Chicago Title's post-breach conduct relative to obtaining new business, as that would be relevant to Chicago Title's capacity and ability to take on additional work. This would not be an improper indicator of whether Chicago Title did or did not mitigate its damages, so long as the evidence is limited to the stated purpose of determining Chicago Title's ability to service new customers.

Lastly, Chicago Title argues that it adequately proved mitigation, which would make the district court's decision regarding its status as a lost volume seller irrelevant. Because neither the district court nor the jury considered this evidence below, it is premature for us to made a determination on this issue.

This is not to say that the evidence conclusively shows that Chicago Title was or was not a lost volume seller, but merely that the district court improperly excluded this evidence from consideration. With this evidence, a genuine issue of material fact exists, and a reasonable person could find that Chicago Title was not a lost volume seller. Therefore, we reverse the district court's grant of Chicago Title's motion for judgment as a matter of law that it was a lost volume seller and remand the case for a new trial on damages on this ground.

### 2. Enforceability of the Covenant for five years

Magnuson and First American also argue that this case should be remanded for a new trial on compensatory damages because the district court erred in instructing the jury that the Covenant was valid for the full five-year period. Although we have found that the Covenant was reasonable for at least a two-year period, we express no decision one way or another as to the Covenant's validity for the full five-year period as written. This uncertainty does not affect our previous discussion of the district court's grant of summary judgment to Chicago Title on the question of Magnuson's liability for breach of the Covenant, because evidence of his conduct that breached the Covenant and supported that decision occurred during the first two years previously determined to have been a reasonable period to protect Chicago Title's legitimate interests. As Magnuson and First American argue, however, the district court subsequently instructed the jury that the Covenant was enforceable through 2006, the full five-year period. Although the district court had both sides brief the issue of the full period's reasonableness prior to instructing the jury, the court failed to incorporate its findings of fact on the issue in any written opinion. The only record is a brief mention of this instruction in the district court's opinion denying Magnuson and First American's post-trial motions. This indicates that the jury's damage calculation may have improperly considered actions taken by Magnuson beyond the time when the Covenant was enforceable.

Numerous Ohio state courts have upheld covenants that extended for three to five years, finding that a covenant of five years is not per se unreasonable. *See, e.g., Briggs v. Butler*, 45 N.E.2d 757, 763 (Ohio 1942) (upholding a five-year non-compete provision); *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 276 (Ohio Ct. App. 2000) (three years); *Matrix Corp. v. Faber*, 146 N.E.2d 447, 451 (Ohio Ct. App. 1957) (five years). Without any further factual development in the district court record as to the reasonableness of the Covenant for a period of five years, however, we are unable to perform the requisite review under *Raimonde* for this longer period of time. For the above reasons, we affirm the district court's ruling that the Covenant was reasonable and enforceable for at least two years, but reverse for a new trial on damages on this additional ground.

### E. Constitutionality of the Punitive Damages Award

In contrast to compensatory damages, which are designed to compensate victims for actual harm suffered as a result of another's wrongful conduct, the purpose of punitive damages is grounded in retribution and deterrence. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001). The Supreme Court has overturned jury verdicts awarding punitive damages that are so large that they constitute "grossly excessive or arbitrary punishments." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). Such punishments do not put citizens on sufficient notice of the possible legal repercussions they may face as a result of their actions, and thus do not satisfy the Constitution's guarantee of due process of law. *Id.* at 416-17. In *State Farm*, the Court confirmed three guideposts for lower courts to use when considering the constitutionality of a punitive damage award that were initially enunciated in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1995). Under these guideposts, a court's decision must be informed by: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 575).

"[C]ourts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards." *Cooper Indus.,* 532 U.S. at 436.

### 1. Reprehensible nature of First American's conduct

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. In making this assessment, the Court has instructed an inquiry into a number of factors, specifically, whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

*State Farm*, 538 U.S. at 419. The harm here was economic, not physical, and the health or safety of others were not in danger. Therefore, the primary considerations to be addressed are Chicago Title's financial vulnerability, whether First American's conduct was repeated, and the culpability of First American's actions. We have already upheld the district court's finding that First American intentionally interfered with the Contract, so we are willing to assume, for sake of argument, that First American acted maliciously rather than by accident. As a result, only two of the factors merit discussion here.

### a. Chicago Title was not financially vulnerable

First American presents Chicago Title as the antithesis of an entity that could be considered to exhibit financial vulnerability, due to the company's large size, as well as its self-professed status as still having the number one position in Ohio a year after Magnuson's departure. On the other hand, there was evidence in the record that a realtor in the area believed that "Chicago Title would be out of business in six months" as a result of First American's actions, that employee morale

within Chicago Title "was at the very bottom," and that rumors existed that Chicago Title was no longer a viable company.

Regardless of the cases cited by the parties, the decisive fact on the instant record is Chicago Title's own testimony that it maintained the number one position in Ohio a year after Magnuson left. Such evidence indicates a general lack of financial vulnerability on Chicago Title's part, despite the initial predictions that the company was placed in dire straits following First American's actions. If First American's conduct was insufficient to unseat Chicago Title as the top player in this market within a year, it would violate the plain meaning of the term to hold that Chicago Title was financially vulnerable. On these facts, Chicago Title does not meet the criteria for being a financially vulnerable victim, and the district court incorrectly found this factor to be present.

> **b.       First American's conduct was not repeated against other companies besides Chicago Title**

In *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 356 (6th Cir. 2005), and citing to *Gore*, we interpreted the repeated conduct factor to "require that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with the plaintiff." Chicago Title argues that this interpretation disregards another teaching of *State Farm*, illustrated in our recent decision in *Clark v. Chrysler Corp.*, 436 F.3d 594, 609-10 (6th Cir. 2006), that the court is not to consider actions taken outside of the forum state when awarding punitive damages.

Chicago Title's argument overlooks a distinction between two different aspects of the analysis. When assessing whether the defendant's behavior was sufficiently reprehensible to support an award of punitive damages, the Supreme Court has noted that consideration of the defendant's conduct against other parties across the country is instructive to the analysis. *State Farm*, 538 U.S. at 419. When it comes to assessing the amount of damages awarded, however, such information is not to be considered, as that would allow a court to punish behavior outside of its jurisdiction that might be lawful in the second state.[6] *Id.* at 420. Here, therefore, Chicago Title's argument that we should disregard *Bach* as inconsistent with the principles of *State Farm* is misplaced.

In this case, Chicago Title presented evidence that First American's conduct of hiring experienced individuals from other title insurance companies was part of its nationwide expansion plan, but the district court did not find that First American engaged in the same type of tortious behavior against other competitors that it displayed against Chicago Title.[7] Without an indication that First American employed tortious tactics against other competitors, its actions here were not repeated, as we have interpreted this factor of the reprehensibility analysis.

> **c.       First American's conduct was not sufficiently reprehensible to support a punitive damage award**

By meeting a higher number of the reprehensibility factors, a plaintiff has a better chance of supporting a jury's award of punitive damages. In *State Farm*, however, the Supreme Court did

---

[6]Similarly, the Court recently affirmed this distinction in reversing a punitive damages verdict that was possibly based upon harm to other individuals who were not parties to the case at bar, although such evidence could be relevant to the reprehensibility issue. *Phillip Morris USA v. Williams*, 549 U.S. ___, 127 S.Ct. 1057, 1064 (2007).

[7]Chicago Title's argument that the district court "precluded [it] from introducing evidence of similar misconduct by [First American] in another market" does not have merit. A review of that portion of the trial transcript reveals that Chicago Title was merely using a deposition from another case against First American for impeachment purposes, and not attempting to demonstrate similar conduct in other markets.

not set a threshold number of the five factors that must be met in order for the defendant's conduct to be sufficiently reprehensible. In fact, the Court stated that the existence of one factor might not be enough, but left open the possibility that an award could still be upheld even if none of the factors were present.[8]

Here, the only factor present is that First American acted with malice. Especially because there were no physical injuries or threat to personal safety as a result of First American's conduct, and because Chicago Title was not a financially vulnerable victim, the fact that First American acted maliciously is insufficient to support a finding that First American's behavior was sufficiently reprehensible for an award of punitive damages. As the Supreme Court instructed in *State Farm*: "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." 538 U.S. at 419. Therefore, an award of punitive damages is inappropriate here, and we reverse the district court on this issue.[9]

### III.

For the foregoing reasons, we **AFFIRM** the district court's opinion in part, **REVERSE** in part, and **REMAND** this case to the district court for a new trial on compensatory damages consistent with this opinion.[10]

---

[8]"The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *State Farm*, 538 U.S. at 419.

[9]Since punitive damages are inappropriate in this case due to insufficient reprehensibility of First American's conduct, a number of its additional arguments are now irrelevant: (1) the two remaining guideposts from *State Farm* (that the ratio between punitive and compensatory damages was too high, and a consideration of similar civil and criminal penalties), (2) that Ohio law and the Ohio state constitution prohibit punitive damages in this case, (3) that Chicago Title's trial conduct prejudiced the jury, and (4) that the case should be remanded for remittitur of the punitive damages award. Thus, we need not address these issues further.

[10]Although we decline to reverse the district court on the issue that the jury instructions did not distinguish between the damages arising from Magnuson's breach of contract and First American's tortious interference with the contract, we note that it is usually proper trial practice to do so. Here, the unavailability of punitive damages and the fact that First American indemnified Magnuson reduce the possible prejudicial effect from the omission. Still, the differing legal characteristics of contract and tort claims suggest that it is typically prudent to request that the jury assign an independent damage figure to each separate theory of recovery.