[Cite as *Lang v. Beachwood Pointe Care Ctr.*, 2017-Ohio-1550.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104691**

# DANIEL P. LANG

PLAINTIFF-APPELLEE

vs.

# BEACHWOOD POINTE CARE CENTER, ET AL.

DEFENDANTS-APPELLANTS

**JUDGMENT:**
VACATED IN PART AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-13-803569

**BEFORE:**   Blackmon, J., Kilbane, P.J., and Laster Mays, J.
**RELEASED AND JOURNALIZED:**   April 27, 2017

**ATTORNEYS FOR APPELLANTS**

Susan M. Audey
Ernest W. Auciello
Jane F. Warner
Tucker Ellis L.L.P.
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Blake A. Dickson
The Dickson Firm
3401 Enterprise Parkway
Enterprise Place, Suite 420
Beachwood, Ohio 44122

Daniel Z. Inscore
3 North Main Street, Suite 703
Mansfield, Ohio 44902

PATRICIA ANN BLACKMON, J.:

{¶1} Brook Pointe Health and Rehab, Inc., d.b.a. Beachwood Pointe Care Center, ("the Nursing Home") appeals from the trial court's rulings on various motions concerning punitive damages, attorney fees, litigation expenses, and survivorship and wrongful death claims in this nursing home negligence case brought by Daniel Lang ("Plaintiff"), as the representative of Mary Stevens's ("Mary") estate. Plaintiff assigns the following errors for our review:

> I. The trial court erred when it denied Beachwood Pointe's motions for directed verdict and for judgment notwithstanding the verdict on Lang's claim for punitive damages because there was insufficient evidence to support the essential elements of this claim, which, in turn, warrants vacating the award for attorney fees and any award of expenses that may be tied to the award of punitive damages.
>
> II. Alternatively, the trial court erred when it denied Beachwood Pointe's motion for a new trial on punitive damages because of errors of law in admitting evidence of insurance and gross revenue during this phase of trial, among other errors.
>
> III. Alternatively, the trial court erred when it denied Beachwood Pointe's motion to enforce R.C. 2315.21.
>
> IV. Alternatively, the trial court erred when it granted Lang's motion for litigation expenses where those expenses were not part of the jury's award, nor are most costs under Civ.R. 54(D).
>
> V. Additionally, the trial court erred when it denied Beachwood Pointe's motion for new trial on the survivorship and wrongful-death claims because of errors of law in admitting evidence of federal regulations for Medicaid and Medicare reimbursement and the records of other residents, and in instructing the jury to disregard evidence of medical bills paid.

**{¶2}** Having reviewed the record and pertinent law, we vacate the punitive damages, attorney fees, and litigation expenses awards and remand for a computation of costs under Civ.R. 54(D). The apposite facts follow.

## Facts and Procedural History

**{¶3}** On March 1, 2012, Mary and her husband Jacob Stevens ("Jacob") became residents of the Nursing Home. Mary had diabetes, high blood pressure, heart disease, and arthritis, was incontinent and in the end stages of renal disease, and had previously suffered a stroke and a heart attack. She was confined to a wheelchair, which she could not operate by herself. Mary also had cognitive impairment and dementia, and she required assistance in all of her daily living activities. As a result of these health issues, Mary had an increased risk for "skin breakdown" including pressure ulcers, which are more commonly known as bedsores. As part of Mary's treatment plan, the Nursing Home staff was to turn or reposition her every two hours and provide incontinence care. Also as part of her care, the Nursing Home sent Mary to an offsite kidney dialysis center three times a week, for three-to-five-hour dialysis treatments.

**{¶4}** On March 24, 2012, at approximately 5:15 p.m., Jacob, who was able to operate his motorized wheelchair, "towed" Mary, who was sitting in her manual wheelchair, by having her hold onto a belt that he threw over his shoulder. This was not the first time that the towing occurred, and Mary's nurse, Enid Harper ("Harper"), told Jacob to stop towing Mary. Jacob stopped at first, but subsequently resumed towing Mary, and as they were entering the dining room, Mary's wheelchair got caught in the

doorway. Mary fell out of her chair onto the floor. The Nursing Home staff assessed Mary, who at the time, reported that she had no pain.

{¶5} The next day, March 25, 2012, Mary reported being in pain. The Nursing Home ordered x-rays, which came back negative. On March 26, 2012, Mary again complained of pain at her dialysis treatment. Mary was sent to the hospital, and this time, the x-rays revealed a nondisplaced hip fracture. The hospital records also noted that Mary had bedsores on her feet. On March 27, 2012, Mary returned to the Nursing Home, where her care plan continued to include turning, repositioning, incontinence care, and off-site dialysis. The Nursing Home had no documentation of bedsores or pressure ulcers at this time.

{¶6} On April 21, 2012, the Nursing Home staff noticed a bedsore on Mary's buttocks. This sore was documented and treated, a care plan was put in place, and Mary's doctor and family were notified. By April 26, 2012, the Nursing Home staff noticed another sore on Mary's buttocks. Additional treatment was ordered, however, Mary's condition continued to worsen, and several other pressure ulcers developed. On May 4, 2012, Mary was admitted to the hospital from the dialysis center with gastrointestinal bleeding and an infected pressure ulcer. On May 27, 2012, Mary passed away. The cause of death was listed as "Infected Decubitus Ulcer" due to "Chronic Kidney Disease" and "Hypertension."

{¶7} On March 22, 2013, Plaintiff filed a complaint against the Nursing Home on Mary's behalf claiming negligence, survivorship, and wrongful death. Plaintiff also

claimed that the Nursing Home's "conduct * * * constituted actual malice." The case went to trial, and on November 3, 2015, the jury found in favor of Plaintiff and awarded $440,000 in compensatory damages.

{¶8} The case then proceeded to the punitive damages phase. Plaintiff presented one witness — Brian Colleran ("Colleran"), who owned the Nursing Home when Mary resided there. Colleran testified that he was not aware of Mary's stay at the Nursing Home or anything that "happened" to her there. Colleran's testimony was limited to how many nursing homes he owned and the fact that they were all self-insured.

{¶9} The Nursing Home moved for a directed verdict arguing that there was insufficient evidence as a matter of law regarding the malice element required for punitive damages. The court denied this motion, and the jury awarded Plaintiff $560,000 in punitive damages. Additionally, the court awarded Plaintiff $400,000 in attorney fees and $31,010.64 in litigation expenses. The Nursing Home filed motions for a new trial, judgment notwithstanding the verdict, and a reduction of punitive damages. On March 10, 2016, the court denied the Nursing Home's motions.

{¶10} It is from these rulings that the Nursing Home appeals. Plaintiff's first four assigned errors address punitive damages, attorney fees, and litigation expenses under alternate theories of law and will be reviewed together.

## Standard of Review
## Directed Verdict and Judgment Notwithstanding the Verdict

{¶11} A motion for a directed verdict "tests the legal sufficiency of the evidence." *McKenney v. Hillside Dairy Co.*, 109 Ohio App.3d 164, 176, 671 N.E.2d 1291 (8th

Dist.1995). "Review of the trial court's denial of [a] motion for a directed verdict * * * requires a preliminary analysis of the components of [the claim]." *Shore, Shirley & Co. v. Kelley*, 40 Ohio App.3d 10, 13, 531 N.E.2d 333 (8th Dist.1988.)

{¶12} "A motion for * * * directed verdict should be denied if there is substantial evidence upon which reasonable minds could come to different conclusions on the essential elements of the claim. 'Conversely, the motion should be granted where the evidence is legally insufficient to support the verdict.'" (Citation omitted.) *McLeod v. Mt. Sinai Med. Ctr.,* 166 Ohio App.3d 647, 2006-Ohio-2206, 852 N.E.2d 1235, ¶ 41 (8th Dist.), *overturned in part on other grounds,* 116 Ohio St.3d 139.

{¶13} Pursuant to Civ.R. 50(A)(4), a motion for directed verdict shall be granted "[w]hen, * * * the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *."

{¶14} "The court does not weigh the evidence or evaluate the credibility of the witnesses; rather, the issue is solely a question of law — did the plaintiff present sufficient material evidence at trial on a claim for relief to create a factual question for the jury?" *Ridley v. Fed. Express*, 8th Dist. Cuyahoga No. 82904, 2004-Ohio-2543, ¶ 82.

## Punitive Damages

{¶15} Upon motion, the trial court in a tort action shall bifurcate the proceeding into two stages. R.C. 2315.21(B)(1). The initial stage relates only to "whether the

plaintiff is entitled to recover compensatory damages for the injury or loss to person or property from the defendant." R.C. 2315.21(B)(1)(a). If the jury finds in favor of the plaintiff, "evidence may be presented in the second stage of the trial, and a determination by that jury shall be made, with respect to whether the plaintiff additionally is entitled to recover punitive * * * damages for the injury or loss to person or property from the defendant." R.C. 2315.21(B)(1)(b).

{¶16} Pertinent to this appeal, "punitive * * * damages are not recoverable from a defendant in question in a tort action unless * * * [t]he actions or omissions of that defendant demonstrate malice[1] * * *." R.C. 2315.21(C)(1). The Ohio Supreme Court has held that "[s]omething more than mere negligence is always required before an award of punitive damages may be made." *Cabe v. Lunich*, 70 Ohio St.3d 598, 602, 640 N.E.2d 159 (1994).

> [A]ctual malice is not limited to cases where the defendant can be shown to have had an "evil mind." We held in *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, that actual malice is present where the defendant possessed either (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

---

[1]At oral argument, the issue of recovering punitive damages under a theory of "ratification" arose. Pursuant to R.C. 2315.21(C)(1), punitive damages may be recoverable if the "defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate" malice. *See Estate of Beavers v. Knapp*, 175 Ohio App.3d 758, 2008-Ohio-2023, 889 N.E.2d 181, ¶ 34 (10th Dist.) ("punitive damages are not recoverable against [an employer] unless [the employer's] actions or omissions demonstrated malice or unless [the employer], as principal or master, authorized, participated in or ratified actions or omissions by [an employee] that demonstrated malice"). Because we find insufficient evidence of malice, we need not reach the issue of whether the Nursing Home ratified actions or omissions of its staff.

*Id.* at 601.

{¶17} When a plaintiff fails to present sufficient evidence of malice on the part of a defendant, the court may properly direct a verdict in favor of that defendant on punitive damages. *McCullough v. Spitzer Motor Ctr.*, 108 Ohio App.3d 530, 536, 671 N.E.2d 306 (8th Dist.1995).

## Evidence Presented at Trial

{¶18} In the instant case, during the liability phase of the trial, various employees or former employees of the Nursing Home testified as to their care and treatment of Mary, specifically focusing on 1) Mary's fall from her wheelchair, and 2) Mary's bedsores or pressure ulcers.

{¶19} Cheryl Jackson, an STNA at the Nursing Home, testified that although she did not see Mary fall out of her wheelchair on March 24, 2012, she had previously seen Jacob "in his motorized wheelchair pull Mary * * * in her standard wheelchair * * * about once or twice." Jackson "intervened and told [Jacob] not to do it. It was unsafe, and if he wanted her to go somewhere, to ask." Jackson further testified that if Mary "said it was dinnertime" and the Nursing Home staff "didn't come right in and get her, [Jacob] would just try to get her down there * * * instead of waiting and letting somebody take her." Jackson also testified that she reported these incidents to the nurse and that she heard other staff tell Jacob that "it was not safe to pull his wife in a wheelchair." Asked if Jackson ever felt like she was "doing anything that was inconsistent with [Mary's] dignity," she answered, "No."

**{¶20}** As to the pressure ulcers, Jackson testified that the staff are taught that if a resident has "an open sore," they are "to be particularly careful" if the resident is incontinent because of the potential for infection. "[Y]ou can't be * * * sure when they had a bowel movement but you should be checking them every hour or so to see if they have been to the bathroom." If the resident needed care, she would "clean them up, apply any kind of ointment, barrier cream to their bottom. Rediaper them, and reposition them if they are unable to move by their self, and raise their head, elevate their feet a little bit." Jackson testified that she followed this procedure when caring for Mary.

**{¶21}** Jackson also testified that it was not her practice to document every episode of incontinence or every time she turned or repositioned a resident. Rather, it was something she did everyday and, after being an STNA for 25 years, "[i]t comes naturally [and] automatically."

**{¶22}** Cindy Marion, an LPN at the Nursing Home, witnessed the March 24, 2012 wheelchair incident. Marion, who was not Mary's assigned nurse, was passing out medication near the dining room when the following occurred:

> I saw [Jacob] coming in his electric wheelchair, and then he went into the dining room door. And behind him was [Mary], and she was in a manual wheelchair, and her wheelchair — the side of her wheelchair caught on the doorway, the door frame. And she was holding onto — he had — I didn't notice at the time because it happened so fast, but he had a belt flung across his right shoulder, and she was holding onto the belt behind him.

> So when her wheelchair hit the frame of the door, she was holding onto the belt, and he kept going and she didn't let go, so she ended up on the floor.

* * *

If it hadn't happened so fast, you know, I probably would have went over to try to stop him from pulling her * * *.  I mean, it was just a matter of seconds, and he was through the door.

**{¶23}** According to Marion, she assessed Mary first, because procedure dictated that the staff not move a resident who may be injured.  After determining that Mary could move her arms and legs, Marion called for Mary's nurse, Enid Harper.

**{¶24}** Harper testified that she was an LPN at the Nursing Home from 1994 to 2013, and she was Mary's nurse during Mary's stay at the Nursing Home. Harper testified that she saw Jacob towing Mary on the evening in question as they were headed toward the dining room.  Harper approached them and told Jacob to stop, because she did not think it was safe.  Jacob stopped towing Mary.  Harper heard one of the aides say that this towing had happened before.  Harper asked Jacob if the staff could take Mary to the dining room.  Jacob replied, "I'll do it."  Harper asked if she could take Jacob's belt.  Jacob said, "No.  How else am I going to do it"?

**{¶25}** Harper testified that she may have told a staff member to take Mary into the dining room, although she was unsure if she made this request.  Harper then left the area to attend to another patient and did not see Mary fall from her wheelchair moments later.

**{¶26}** When Harper was alerted to what happened, she went to the dining room doorway and learned that Mary was not in pain.  Harper helped Mary back into her wheelchair, documented the fall, left a message with Mary's doctor's answering service, and notified Mary's daughter about the incident.

**{¶27}** Ebonie Davis, an LPN who worked at the Nursing Home as the wound and infection patrol nurse, testified regarding Mary's bedsores. On April 21, 2012, Davis first documented a single wound on Mary's coccyx area that reached to her left and right buttocks. Davis testified that she treated this bedsore, as evidenced in Mary's Treatment Administration Records ("TAR"), on April 23, 24, 25, and 26, 2012.

**{¶28}** Davis additionally noted a "new area of skin breakdown on April 26, 2012." Both bedsores were Stage IV wounds, which "means muscle, tendon or bone is exposed." At this time, Davis noted "no signs of infection." Davis ordered Mary an alternating air mattress to relieve the pressure. Davis also noted that repositioning Mary had become more difficult since her hip fracture, because she complained of pain when lying on her left side.

**{¶29}** Davis called Mary's dialysis center and requested that they use Mary's wheelchair cushion in the dialysis chair because of her sores. According to Davis, Mary sat in a "hard chair" at the dialysis center for three to five hours, three times a week. Davis called Mary's daughter to "touch base with her and let her know what [Davis] and the nurses at the dialysis center talked about." Davis also notified Mary's doctors of the status of her sores.

**{¶30}** Davis testified that she also treated Mary's bedsores on April 27, 2012, when Davis and the nurse practitioner changed Mary's treatment plan; however, this TAR was not written until April 28, 2012. Davis testified that Mary's incontinence increased the risk of developing pressure wounds and decreased the rate at which they healed,

particularly if she was not changed and cleaned. Davis also testified that "turning and repositioning is a standard of care. It's a practice," and is not something that the Nursing Home staff document on a TAR. Davis stated, "I can't say I ever have seen documentation of anybody being turned and repositioned."

**{¶31}** In addition to the Nursing Home staff, Plaintiff called two medical expert witnesses to testify about Mary's case. During the liability phase of the trial, both experts testified that the standard of care in nursing homes, pertinent to the case at hand, is to provide residents with a safe environment and adequate supervision to prevent accidents. Additionally, nursing homes should ensure that a resident who entered the facility without pressure sores did not develop pressure sores unless the individual's clinical condition demonstrated that they were unavoidable. If pressure sores are present, the nursing home's duty is to provide necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing.

**{¶32}** Catherine Sinclair, who is a nurse practitioner, was the first expert witness to testify for Plaintiff. Sinclair concluded that, in her opinion, the Nursing Home fell below the standard of care in treating and caring for Mary. Sinclair looked at two main events — Mary's fall and her subsequent pressure ulcers. According to Sinclair, the Nursing Home was negligent by not taking "the next step forward, which would be to go over to try to intervene" when the staff saw Jacob towing Mary. Additionally, Sinclair opined that, other than reminding Jacob not to tow Mary, the Nursing Home was negligent by not changing Mary's care plan after the fall.

**{¶33}** Sinclair further testified that, as long as nursing home residents are "cognitively intact," they "must be permitted to exercise their rights free from interference or coercion from the nursing home." Sinclair agreed that not all falls or accidents are preventable and that there is "not a one-on-one care in a nursing home."

**{¶34}** Sinclair also testified that the Nursing Home was negligent regarding Mary's sores. Sinclair noted that there was no documentation of turning or repositioning Mary, which, in her opinion, fell below the standard of care. According to Sinclair, as the pressure ulcers developed, Mary needed to be repositioned more than every two hours. Additionally, there was no written documentation of Mary's wound dressings being changed on April 27, 2012. By April 30, 2012, Mary had developed multiple ulcers on her feet, and Sinclair's opinion was that the Nursing Home was negligent in not ordering special boots before this happened, rather than after the sores were noted.

**{¶35}** Based on the specific conduct detailed above, Sinclair concluded that the Nursing Home was negligent because it did not do enough to care for and treat Mary.

**{¶36}** As to malice, the only testimony Sinclair provided is as follows: Asked if "the conduct of these defendants in this case demonstrate[d] a conscious disregard for the rights and safety of others, including Mary Stevens," Sinclair answered, "Yes."

**{¶37}** Sinclair also provided an expert report, the last paragraph of which states as follows:

> [Plaintiff's counsel] specifically asked me if the conduct of the defendants in this case demonstrated a conscious disregard for the rights and safety of other persons including Mary Stevens that had a great probability of causing substantial harm. In my opinion the conduct of the defendants in this case

did demonstrate a conscious disregard for the rights and safety of other persons including Mary Stevens that had a great probability of causing substantial harm and as a result substantial harm occurred.

{¶38} Dr. Tim Klein, who is a doctor of internal medicine at a nursing home, also testified as an expert witness for Plaintiff. Similar to Sinclair, Dr. Klein testified in detail about his opinion that the Nursing Home was negligent in treating and caring for Mary. However, also similar to Sinclair, Dr. Klein's testimony about malice was limited to his conclusion. In Dr. Klein's expert report, his opinion on malice is covered in one conclusory sentence: "The monitoring and care provided at Beachwood Pointe Care Center demonstrated a course of conduct and/or systemic problems which evidenced willful and wanton disregard for the health and safety of Ms. Stevens."

{¶39} Asked to explain what he meant by that to the jury, Dr. Klein testified as follows:

Willful and wanton is a term that frequently is used legally, but in my experience, I also use that because if something is willful and wanton, essentially there is a conscious disregard, a reckless disregard of safety of others. And there's either knowledge that something bad can happen, and you just disregard that possibility. And it's conscious. You know that that's not safe, but you don't do anything about it. And, to me, it's just basically an utter indifference. It's a conscious disregard of safety. So that's what I meant by that.

**{¶40}** Neither Sinclair nor Dr. Klein identified an act or omission by the Nursing Home that rose to the level of conscious disregard.

## Legal Analysis

**{¶41}** "An expert may not offer an opinion which embraces the 'ultimate issue' if that opinion is essentially a bare conclusion significantly lacking in supporting rationale." *Gannett v. Booher*, 12 Ohio App.3d 49, 52, 465 N.E.2d 1326 (6th Dist.1983). "By requiring opinion testimony concerning the ultimate issue to conform to [the rules], ample assurance is afforded against opinion evidence being admitted which would merely inform the trier of fact of what result to reach." *Id.* at 53. *See also McCoy v. McCoy*, 91 Ohio App.3d 570, 576, (8th Dist.1993) (applying *Gannett* to conclude that the evidence in the record was "not adequate support for the [expert's] conclusion. * * * Although considerable latitude must be given to expert testimony * * * the testimony nonetheless must have a rational basis and not depend merely on the conclusion of the expert witness").

**{¶42}** Furthermore, this court has held that "an expert's interpretation of the law should not be permitted as testimony, as the interpretation of the law is within the sole province of the court." (Citation omitted.) *Scharf v. Chorney*, 8th Dist. Cuyahoga Nos. 64405 and 64406, 1994 Ohio App. LEXIS 611 (Feb. 17, 1994).

**{¶43}** In the case at hand, after the punitive damages phase of the trial, the court heard extensive and, at times, contentious argument on the record about the Nursing Home's motion for directed verdict. Excerpts from this argument follow:

DEFENSE COUNSEL:  First, we would say that there was no evidence in this phase of trial regarding conscious disregard of any harm.  So, therefore, the issue cannot go to the jury.

* * *

PLAINTIFF'S COUNSEL: There's a long line of cases where it's clear that the Court's judgment must not be substituted for that of the jury, and * * * it has [been] held reversible error for the Court to substitute its own judgment for the jury's judgment. * * * Furthermore, * * * the employer ratifies its employees' conduct by retaining the employee after the malicious acts have occurred.

* * *

THE COURT: Okay.  Okay.  You said malicious acts. What malicious acts?

PLAINTIFF'S   COUNSEL: So  they  consciously disregarded Mary Stevens' right to safety by allowing her husband to tow her over and over and over again.   Every  witness  testified that they knew that was unsafe.

THE COURT: Okay.   What else?

PLAINTIFF'S COUNSEL: They consciously disregarded her right to adequate treatment when they didn't change her dressings, didn't turn and reposition her, didn't monitor the wounds as the policies required. * * * So, you know, this jury has already heard evidence of a conscious disregard for Mary Stevens' rights and safety and they all acknowledged that that conscious disregard had a great possibility of causing her substantial harm.

* * *

DEFENSE COUNSEL: I haven't heard any * * * evidence in the first stage of the lawsuit that would cause the jury to change their opinion from negligence to conscious disregard for the rights and safety.   And more than negligence is required to entitle a plaintiff to recover punitive damages.

* * *

THE COURT: My inclination is to grant the directed verdict on punitive damages. I don't * * * see testimony that supports conscious disregard for the rights of [Mrs.] Stevens. Negligence, yes, but not a conscious disregard.

PLAINTIFF'S COUNSEL: Your Honor, the Supreme Court of Ohio * * * says the Court's judgment must not be substituted for that of the jury's. * * * *Zoppo v. Homestead* and *Moskovitz*. In *Moskovitz*, the trial courts were overturned from taking that decision away from the jury. The jury is out there. We're done.

* * *

THE COURT: Are you saying that I can't rule on a motion for directed verdict?

PLAINTIFF'S COUNSEL: On the issue of punitive damages, I am, your Honor.

DEFENSE COUNSEL: That's absurd.

PLAINTIFF'S COUNSEL: There's clear case law that says it is the decision of the jury and the only way you can rule on punitive damages [is if] there's no possible way this jury could find punitive damages. They've certainly heard enough evidence to find punitive damages in a nursing home case.

* * *

THE COURT: * * * [B]efore submitting the issue of punitive damages to a jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her acts had a great possibility of causing substantial harm. Furthermore, the Court must determine that sufficient evidence is presented revealing that party consciously disregarded the injured party's rights or safety.

* * *

PLAINTIFF'S COUNSEL: In *Preston v. Murty*, the issue went to the jury. * * * *Preston v. Murty* doesn't say that it's appropriate to rule on a directed verdict on punitive damages. * * *

THE COURT: Yes, but * * * it says that the trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a probability of causing harm.

PLAINTIFF'S COUNSEL: That's clear in this case. They were aware that a fall could cause a fracture.

THE COURT: It's not for you to say. * * *

PLAINTIFF'S COUNSEL: It's for the jury to say. We've given you five Supreme Court cases that say that. The jury is to decide punitive damages. That's what *Zoppo v. Homestead* says.

THE COURT: Yes, they should decide punitive damages if it meets the definition of punitive damages.

PLAINTIFF'S COUNSEL: How could you possibly say that they did not consciously disregard the rights.

THE COURT: I can.

PLAINTIFF'S COUNSEL: How could you possibly say that no jury could possibly say they did? * * * You're reading the actual malice standard. You're not reading the directed verdict standard.

* * *

DEFENSE COUNSEL: You make a determination whether he's met a burden.

PLAINTIFF'S COUNSEL: No, you don't. That's not what a directed verdict motion is. * * * So you're telling me [the jury] couldn't possibly come to a conclusion in my favor. How can you say that?

THE COURT: Because I heard the evidence. * * * Then you know what? You don't need to have a judge in any of your cases then. Just a jury. You don't need a judge.

PLAINTIFF'S COUNSEL: You told them they're the judges of the facts. This is a fact issue. This isn't a legal issue. This is a fact issue. * * * They have the evidence. They should be allowed to make this decision.

There's a litany of cases that says that it's not appropriate for the trial court to take it away from the jury at the end.

DEFENSE COUNSEL: Your Honor, that's the meaning of a directed verdict.

* * *

PLAINTIFF'S COUNSEL: So if you resolve all doubts in my favor, you're saying this jury couldn't possibly find that they disregarded Mary Stevens' rights to a safe environment, right to adequate supervision when they let her husband tow her time and time again. They all testified it was unsafe. They all testified that if she fell, she could suffer a fracture.

THE COURT: I know that.

PLAINTIFF'S COUNSEL: But that's the evidence, and so clearly they consciously disregarded her rights and safety.

THE COURT: That's what you say.

PLAINTIFF'S COUNSEL: Then I offered an expert witness who was qualified and came to this court to give expert testimony, and she said the same thing. * * * How can you say that reasonable minds cannot come to the conclusion in light of the evidence in this case? They neglected her and ignored her over and over again. They all testified it was unsafe.

THE COURT: * * * [Y]ou're * * * saying this is what the testimony showed. * * *

PLAINTIFF'S COUNSEL: Correct. And it is.

THE COURT: That's not necessarily what the jury's going to say. That's not what I say either.

PLAINTIFF'S COUNSEL: * * * For this purpose, you actually do have to believe that because you have to construe the facts in my favor.

* * *

DEFENSE COUNSEL: Your Honor, you are construing facts. You're not saying any of his witnesses lied or anything changed. You're saying the facts as they are do not give rise to punitive damages * * *.

PLAINTIFF'S COUNSEL: We had an expert who testified to it.

THE COURT: Who testified that there was conscious disregard?

PLAINTIFF'S COUNSEL: Catherine Sinclair, the expert nurse, * * * took this witness stand and testified to this jury that this defendant demonstrated a conscious disregard for the rights of Mary Stevens that substantial harm was certain to occur, and she put it in her report and she testified to it on the stand. * * * How can you say that having elicited expert testimony on this * * * we're going to lose on directed verdict? * * * In fact, * * * you have to believe this. This is a fact that is in my favor so how can you ignore that?

THE COURT: I'm not ignoring that * * * . I'm construing it. That doesn't mean that that says that you're on the winning side.

* * *

DEFENSE COUNSEL: Even if [the court] construes facts in your favor, what a directed verdict says is that those facts don't rise to * * * the standard to award punitive damages.

PLAINTIFF'S COUNSEL: How can you say the jury can't do that? [The Nursing Home is] fighting this because they're about to get punitive damages.

* * *

DEFENSE COUNSEL: We should just give up? Is that your position? Good Lord. Sorry. This is just ridiculous. I have never * * * seen such reprehensible behavior. This is unbecoming. I'm sorry.

PLAINTIFF'S COUNSEL: This [is] about to be a huge error that's going to send us to the Court of Appeals to send it back and try this case a second time.

* * *

DEFENSE COUNSEL: That's not the way it works.  By you giving it to the jury is telling the jury there's sufficient facts where they can find it.

PLAINTIFF'S COUNSEL: That's not true.

THE COURT: It is.

PLAINTIFF'S COUNSEL: * * * There's no possible way that reasonable minds could find actual malice?   How can you possibly say that?

THE COURT: Because that's how I construe it.

PLAINTIFF'S COUNSEL: Okay.   But * * * you're substituting your view for the jury's.   It's reversible error.

THE COURT: Show me where it's reversible error.

PLAINTIFF'S COUNSEL: In the *Zoppo v. Homestead* case.   It said a jury —

THE COURT: I can read.   Okay.

DEFENSE COUNSEL: Is there a case or is that just a summary?

PLAINTIFF'S COUNSEL: You've never heard of *Zoppo*?

DEFENSE COUNSEL: I've heard of it. * * * Your Honor, this doesn't tell me anything different than what we've been arguing.   Certainly it is within your discretion to review the evidence and determine whether reasonable minds can differ as to whether the plaintiff met the burden * * *.  [C]ertainly, if you determine that plaintiff met the burden, it goes to the jury, but this doesn't change anything.   It just says that the issue can go to the jury, and the judge, like you've said earlier, has discretion to grant a directed verdict on anything.

* * *

PLAINTIFF'S COUNSEL: [*Zoppo* and *Moskovitz* say] it's reversible error for the Court to substitute its judgment for that of the jury, to invade the province of the finder of fact.   Malice is a fact.   It's not an issue of law, the determination of actual malice. * * * You're going to give it to [the jury] properly, but they are entitled to determine the facts in this case. * * *

That's an issue of fact.  It's a determination of fact.  It is not a determination of law.

THE COURT: I disagree with you, but we're going to go forward.  Okay. I'm going to go forward and see what they say.   I totally disagree with you.

DEFENSE COUNSEL: Your Honor, if you totally disagree with him, you need to grant the motion.

THE COURT: No, no.  I'm not going to do that because * * *, I may be wrong, but this is my thought is that there's no actual malice here.

{¶44} Upon review, we find eleven instances when the court stated on the record that it did not find sufficient evidence of actual malice.  We further find at least nine instances of plaintiff's counsel not accepting the court's position, including repeated use of the phrase "How can you possibly say that?" as well as "warning" the court that it was about to commit a "huge" error.  Additionally, we find multiple instances of plaintiff's counsel misrepresenting the law to the court.

{¶45} First, counsel incorrectly stated the holdings of three Ohio Supreme Court cases.  *Zoppo* and *Moskovitz* stand for the proposition that the *amount* of punitive damages should be decided by a jury.  *Zoppo v. Homestead, Ins. Co.*, 71 Ohio St.3d 552, 557, 644 N.E.2d 397 (1994) (declaring former R.C. 2315.21(C)(2) unconstitutional, because it permitted "only the court to determine the amount of punitive damages"); *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 651-652, 635 N.E.2d 331 (1994) (because "the jury was presented with sufficient evidence which, if believed, supported the inference [of malice], * * * the issue of punitive damages should [be] submitted to the jury.")

**{¶46}** Additionally, counsel argued that "*Preston v. Murty* doesn't say that it's appropriate to rule on a directed verdict on punitive damages." However, that is precisely what the *Preston* Court held:

> [B]efore submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety.

*Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174 (1987).

**{¶47}** Second, counsel argued that the trial court "can't" rule on a motion for directed verdict regarding punitive damages. This is incorrect. As held in *Preston*, the court "must review the evidence" before it sends the issue of punitive damages to the jury. Counsel further argued that a directed verdict is not a determination of whether a party has met a burden. Counsel is wrong. Generally, a directed verdict tests "the legal sufficiency of the evidence to take the case to the jury." *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68, 430 N.E.2d 935 (1982).

**{¶48}** Third, counsel argued that actual malice, at the directed verdict stage of the proceedings, "is a fact issue. This isn't a legal issue." However, the exact opposite is true. When ruling on a motion for directed verdict, "what is being tested is a question of law * * *. Our determination that a motion for directed verdict presents a question of

law, and not a factual issue, is consistent with previous decisions of this court." *Id.* at 68-69. *See also Ridley v. Fed. Express*, 8th Dist. Cuyahoga No. 82904, 2004-Ohio-2543, ¶ 82 (regarding a directed verdict, "the issue is solely a question of law — did the plaintiff present sufficient material evidence at trial on a claim for relief to create a factual question for the jury"?*)

{¶49} Fourth, counsel asked the court, "How can you say that having elicited expert testimony on [malice] we're going to lose on directed verdict"? The answer is that plaintiff's expert's testimony on malice was not supported by sufficient evidence in the record. It is well within the court's discretion to grant a directed verdict if a plaintiff fails to present sufficient evidence on an issue.

{¶50} Fifth, when the Nursing Home's counsel and the court agreed that, by giving an issue to the jury, the court is telling the jury that there is sufficient evidence to create a factual question, plaintiff's counsel stated, "That's not true." Once again, plaintiff's counsel is incorrect. "A motion for a directed verdict presents a question of law which tests 'the legal sufficiency of the evidence to take the case to the jury.'" *Brubaker-Schaub v. Geon Co.*, 8th Dist. Cuyahoga No. 75694, 2001 Ohio App. LEXIS 142 (Jan. 18, 2001).

{¶51} Sixth, plaintiff's counsel appears to be under the mistaken belief that the Nursing Home's mere knowledge that Jacob and Mary were engaging in unsafe behavior that could result in harm is sufficient evidence of malice. Plaintiff's counsel argued that "[e]very witness testified that they knew [the towing] was unsafe [and] [t]hey were

aware that a fall could cause a fracture. * * * They all testified that it was unsafe. They all testified that if she fell, she could suffer a fracture."

{¶52} Knowledge of unsafe behavior that could result in harm is a classic example of negligence. "A negligent act or omission may be one which involves an unreasonable risk of harm to another through * * * the foreseeable action of the other * * * ." Restatement of the Law, 2d, Torts, Section 302(b) (1965). "The possibility of an event occurring is not enough of a factor to convert the behavior from negligence to reckless." *Marsh v. Heartland Behavioral Health Ctr.*, 10th Dist. Franklin No. 09AP-630, 2010-Ohio-1380, ¶ 38. *See also Wallace v. Ohio DOC*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018 ¶ 23, (negligence "depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied").

{¶53} However, something more than mere negligence is required for a punitive damages award.

> This concept is reflected in the use of such terms as "outrageous," "flagrant," and "criminal." The concept requires a finding that the probability of harm occurring is great and that the harm will be substantial. A possibility or even probability is not enough as that requirement would place the act in the realm of negligence. A requirement of substantial harm would also better reflect the element of outrage required to find actual malice.

*Preston*, at 335-336.

**{¶54}** In addition to a "great probability of causing substantial harm," a defendant must have acted with "conscious disregard" before punitive damages may be awarded. In *Calmes v. Goodyear Tire & Rubber Co.*, 61 Ohio St.3d 470, 473, 575 N.E.2d 416 (1991), the Ohio Supreme Court, held that "punitive damages are intended to punish and deter conduct resulting from a mental state so callous in its disregard for the rights and safety of others that society deems it intolerable."

**{¶55}** Furthermore, "it is evident that a reckless actor, who only has knowledge of the mere possibility that his or her actions may result in substantial harm, is not behaving maliciously." *Motorists Mut. Ins. Co. v. Said*, 63 Ohio St.3d 690, 698, 590 N.E.2d 1228 (1992). *See also Walsh v. Starck Van Lines*, 10th Dist. Franklin No. 81AP-102, 1981 Ohio App. LEXIS 12135 (Sept. 29, 1981) (concerning actual malice, "this issue is whether there is some competent credible evidence that defendant acted with a motive to injure plaintiffs").

**{¶56}** In the case at hand, plaintiff failed to present evidence of a "callous" mental state or a motive to injure Mary. The Nursing Home staff testified that, in the past, they either intervened or told Jacob to stop when they saw him tow Mary. In other words, nobody testified that they disregarded the towing.

**{¶57}** At oral argument, plaintiff's counsel stated that "seven or eight" Nursing Home employees watched the incident, pointing their fingers at Mary and Jacob but doing nothing to prevent the towing. This is not what was testified to at trial. The only person to testify that she saw the fall was Marion, who stated that it happened so fast there was

nothing she could have done about it.  Harper testified that she saw Jacob tow Mary before the incident and agreed that there were other staff in the hallway when she approached the couple and told them to stop.

{¶58} Additionally, plaintiff failed to present substantial, competent, and credible evidence of a great probability of harm.  It is worth noting that the "unsafe" behavior of towing a wheelchair was initiated and executed by Mary and Jacob Stevens.  The Nursing Home staff did not "consciously disregard" this.  Rather, the evidence showed, and the jury found, that they were negligent in handling the situation.

{¶59} In terms of the bedsores, plaintiff's counsel stated at oral argument that the Nursing Home staff failed to turn and reposition Mary.  Once again, this is simply unsupported by the record.  The Nursing Home staff members who cared for Mary testified that they turned and repositioned her as required, but that they were not in the practice of documenting this.  There is a substantial difference between not doing an act and not writing it down.

{¶60} The Tenth District Court of Appeals has held that, in determining whether a defendant's mental state resulted in malicious conduct, courts must consider what the defendant "*did* do," just as much as courts consider what the defendant failed to do or could have done better.  (Emphasis sic.)  *Estate of Schmidt v. Derenia*, 158 Ohio App.3d 738, 2004-Ohio-5431, 822 N.E.2d 401, ¶ 25 (10th Dist.).  There is evidence in the instant case showing that the Nursing Home fell below the standard in caring for and treating Mary.  However, this is not a case where the defendant intentionally acted, or failed to

act, knowing that substantial harm will probably occur. There is no evidence of hatred, ill-will, or a spirit of revenge. There is no evidence that the Nursing Home was understaffed or deliberately apathetic about Mary's care. There is no evidence that the Nursing Home treated patients in a way to maximize profitability or minimize expenses. And there is no evidence that the Nursing Home staff encouraged, enabled, or ignored Jacob's tendency to tow Mary using their wheelchairs.

{¶61} In reviewing the testimony in the case at hand, we find insufficient evidence of malice on the part of the Nursing Home staff regarding Mary falling from her wheelchair after being towed by Jacob.

{¶62} As to the issue of Mary's bedsores, there simply is no evidence — let alone sufficient evidence — in the record that the Nursing Home staff acted with malice in treating Mary's pressure ulcers. Therefore, after construing the evidence in favor of plaintiff, as we must, we find that plaintiff failed to present sufficient evidence of malice, which is a requirement in a punitive damages claim. Accordingly, because there were no factual questions for the jury to resolve concerning actual malice, the trial court erred by denying the Nursing Home's motion for directed verdict regarding punitive damages.

{¶63} While we are sympathetic to Mary's injuries and eventual passing, as well as the suffering of her family, damages in a tort action are intended to make a plaintiff whole "for wrong done to him or her by the defendant." *Fantozzi v. Sandusky Cement Prod.*, 64 Ohio St.3d 601, 612, 597 N.E.2d 474 (1992). Compensatory damages should reflect the economic and noneconomic losses resulting from a defendant's negligence. *See*

*Melenick v. McManamon*, 8th Dist. Cuyahoga Nos. 92453 and 92675, 2010-Ohio-1051. Without sufficient evidence of actual malice, the matter should not have gone to the jury for consideration.

### Attorney Fees and Litigation Expenses

**{¶64}** Generally, under the American Rule, the prevailing party in a lawsuit may not recover attorney fees or litigation expenses unless 1) there is a statutory duty to pay fees, 2) the parties contract to shift fees, or 3) the losing party acted in bad faith. *See Wills v. Kolis*, 8th Dist. Cuyahoga No. 93900, 2010-Ohio-4351, ¶ 53; *Ohio Edison Co. v. Franklin Paper Co.*, 18 Ohio St.3d 15, 16, 479 N.E.2d 843 (1985).

**{¶65}** Based on our conclusion that punitive damages were improperly awarded in this case, the $400,000 in attorney fees and $31,010.64 in litigation expenses cannot be awarded on a theory of "bad faith." Furthermore, plaintiff makes no argument that the attorney fees and litigation expenses award was authorized by statute or a contract between the parties in this case. Therefore, we find that no exception to the American Rule applies, and the attorney fees and litigation expenses award cannot stand.

**{¶66}** Additionally, as to the "litigation expenses" award, we find that the $31,010.64 awarded in the case at hand included both litigation expenses and litigation costs. Litigation expenses, which include attorney fees, are not recoverable under the American Rule unless a noted exception applies.

**{¶67}** Civ.R. 54(D), on the other hand, allows "costs" to be awarded to the prevailing party. Generally, costs include "the statutory fees to which officers,

witnesses, jurors and others are entitled for their services in an action * * * and which the statutes authorize to be taxed and included in the judgment * * *." However, the Ohio Supreme Court "has consistently limited the categories of expenses which qualify as 'costs.'" *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*, 69 Ohio St.2d 50, 50, 430 N.E.2d 925 (1982). For example, expert witness fees and reports, as well as expenses associated with depositions, are generally not taxable as costs. *Naples v. Kinczel*, 8th Dist. Cuyahoga No. 89138, 2007-Ohio-4851. However, the costs of procuring a transcript, when "necessary in * * * [a] civil action" may be recoverable by the prevailing party. R.C. 2303.21.

{¶68} Attached to the court's June 13, 2016 journal entry granting, in part, plaintiff's motion for "litigation expenses" is a list of the costs and expenses for which plaintiff sought reimbursement. Line items noted as "depo prep" for $1,006.25 and "document review" for $1,181.25, for example, are litigation expenses that were improperly awarded to plaintiff. Additionally, Dr. Klein's expert witness "trial bill" for $10,217.16 and Sinclair's expert witness "trial testimony and expenses" for $4,370.77 were also improperly awarded.

{¶69} Accordingly, the Nursing Home's first assigned error is sustained. The punitive damages, attorney fees, and litigation expenses awards are vacated. Our analysis of plaintiff's costs versus expenses is intended to be demonstrative rather than exhaustive. Upon remand, the trial court is directed to award plaintiff costs pursuant to Civ.R. 54(D) and other appropriate law.

**{¶70}** Pursuant to App.R. 12(A)(1)(c), assigned errors two, three, and four are moot in light of our disposition of plaintiff's first assigned error.

## Standard of Review
## Motion for New Trial — Survivorship and Wrongful Death Claims

**{¶71}** In the fifth and final assigned error, the Nursing Home argues that the court should have granted a new trial on the survivorship and wrongful death claims because of improperly admitted evidence and improper jury instructions. Specifically, the Nursing Home alleges that it was error for the court to admit "evidence of federal regulations for Medicaid and Medicare reimbursement and the records of other residents, and in instructing the jury to disregard evidence of medical bills paid."

**{¶72}** The Nursing Home claims that it is entitled to a new trial under Civ.R. 59(A)(9), which states in part that "[a] new trial may be granted * * * upon [an] [e]rror of law occurring at the trial and brought to the attention of the trial court by the party making the application."

## Admission of Evidence

**{¶73}** "The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 43. Upon review, "we confine our inquiry to determining whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issues about which [the Nursing Home] complains." *Id.*

**{¶74}** Generally, relevant evidence is admissible at trial unless "its probative value is substantially outweighed by the danger of unfair prejudice." Evid.R. 402 and 403(A). Violations of governmental regulations may not be used to establish negligence *per se*; however, violations of these rules may be admissible as evidence of negligence. *See Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 697 N.E.2d 198 (1998).

**{¶75}** In the case at hand, plaintiff established the standard of care for nursing homes using two expert witnesses and various employees or former employees of the Nursing Home, as well as the Nursing Home's policies and procedures. Therefore, we cannot say that the admission of federal regulations regarding nursing homes was unfairly prejudicial.

**{¶76}** Turning to the Nursing Home's argument that it was error to admit into evidence the medical records of patients other than Mary, we find this allegation merely speculative. The court allowed plaintiff to introduce into evidence the TARs of other patients of the Nursing Home to show that, at times, turning and repositioning a patient was documented by the staff.

**{¶77}** The Nursing Home alleges that these medical records are protected under 45 C.F.R. 160.013 and subject to penalties for unauthorized disclosure pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"). Plaintiff, on the other hand, claims that the disclosure of these medical records was authorized by the residents, whose identities were redacted.

**{¶78}** In any event, it does not appear that the identity of these other residents is revealed anywhere in the record. Additionally, merely asserting violations of certain statutes raises issues of injury-in-fact for the purpose of standing. Furthermore, the Nursing Home did not bring a counterclaim alleging a HIPAA violation, and this court does not indulge itself in advisory opinions.

**{¶79}** Upon review, we find that this evidence is relevant and its probative value outweighs any danger of prejudice to the Nursing Home. *Compare* Evid.R. 613 ("conduct of the witness inconsistent with the witness's testimony may be shown to impeach.")

**{¶80}** Accordingly, we find no abuse of discretion in the court's admission of the evidence at issue.

## Jury Instructions

**{¶81}** A jury instruction should be an accurate statement of law applicable to the facts in evidence of the case. *Rodata, Inc. v. Christian & Timbers*, 8th Dist. Cuyahoga No. 79439, 2002 Ohio App. LEXIS 50 (Jan. 10, 2002). Furthermore, a "jury charge must be considered as a whole and a reviewing court must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990).

## Evidence of Medical Bills Paid

**{¶82}** In a personal injury or wrongful death action, "both the original medical bill rendered and the amount accepted as full payment for medical services should [be] admitted" into evidence. *Robinson v. Bates*, 112, Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, ¶ 6. "The jury may decide that the reasonable value of medical care is the amount originally billed, the amount the medical provider accepted as payment, or some amount in between." *Id.* at ¶ 18.

**{¶83}** In *Jaques v. Manton*, 125 Ohio St.3d 342, 2010-Ohio-1838, 928 N.E.2d 434, ¶ 9-10, the Ohio Supreme Court clarified that, in determining the reasonable value of medical bills, evidence of subrogated collateral source payments is inadmissible. "For example, the jury would not be permitted to learn of insurance coverage for injuries suffered by the plaintiff, because the wrongdoer is expected to bear the burden of his actions rather than benefit from the plaintiff's diligence in carrying insurance." *Id.* at ¶ 7.

**{¶84}** A typical jury instruction relating to the value of medical services in light of *Robinson* is:

> In determining the reasonable value of medical, hospital or other related care, treatment, services, products or accommodations you shall consider all of the evidence submitted. Both the original bill and the amount accepted as full payment may be considered along with all other evidence to determine the reasonable value.

3 Ohio Jury Instructions (2009), Section 315.01.

**{¶85}** In the case at hand, the court charged the jury with the exact instruction quoted above, and the court admitted into evidence medical bills reflecting the amount

billed, which was $110,000, and the amount paid, which was $37,125. In addition, the court instructed the jury as follows: "there will be some bills submitted to you that have scratch offs on them, and indications of payments. You are instructed to disregard the lines that say payments. It has nothing to do with your job as I instructed you. You are not to consider any payments by a third party if it's indicated on the bill."

{¶86} The jury awarded plaintiff $110,000, which is what plaintiff's counsel requested. Given the law governing the value of medical services in personal injury and wrongful death cases, as well as the evidence admitted at trial, we find the court's jury instructions regarding this issue to be legally accurate based on the facts presented. We cannot say that these instructions "probably misled" the jury, and the Nursing Home's fifth assigned error is overruled.

{¶87} The punitive damages, attorney fees, and litigation expenses awards are vacated, and this case is remanded to the trial court for a determination of a litigation cost award pursuant to Civ.R. 54(D).

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, JUDGE CONCURS;

ANITA LASTER MAYS, J., CONCURS;
MARY EILEEN KILBANE, P.J., DISSENTS
(SEE ATTACHED DISSENTING OPINION)

MARY EILEEN KILBANE, P.J., DISSENTING:

{¶88} I concur with the majority's resolution of the Nursing Home's second, third, fourth, and fifth assignments of error. However, I respectfully dissent from the majority's decision to vacate the punitive damages award.

{¶89} The majority concludes that there was insufficient evidence of malice and the matter should not have gone to the jury. Contrary to the majority's holding, I would find that punitive damages are recoverable under a theory of ratification pursuant to R.C. 2315.21(C)(1), as raised by plaintiff's counsel to the trial court during the discussion regarding the Nursing Home's motion for directed verdict and at appellate oral argument. Under R.C. 2315.21(C)(1), punitive damages against the Nursing Home are appropriate only if the Nursing Home ratified malicious conduct by its employees. *Knapp*, 175 Ohio App.3d 758, 2008-Ohio-2023, 889 N.E.2d 181, at ¶ 35.

{¶90} Relevant to this appeal, malice is defined as "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston*, 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus. The "conscious disregard"

concept requires a finding that "the probability of harm occurring is great and that the harm will be substantial." *Preston* at 336.

{¶91} I would find that the Nursing Home demonstrated a conscious disregard for Mary's safety because it was aware that Jacob was pulling Mary along with his belt, yet the record reveals that the Nursing Home did nothing to prevent it from happening again. In fact, it was so common place that the Nursing Home employees had a name for it — "towing." Right before the incident occurred, Harper (Mary and Jacob's nurse) testified that she shouted out to Jacob that "towing" was not safe. However, Harper did not intervene and stop the "towing," nor did the other employees who were in the hallway as Jacob and Mary passed by them. Nursing Home employees testified that Jacob has "towed" Mary before and this conduct was not safe, yet they continued to allow it to happen. The Nursing Home demonstrated that it tolerated this unsafe behavior by not preventing Jacob from repeatedly "towing" Mary. The Nursing Home did not have an employee accompany Jacob and Mary to the dining hall, and there was no reprimand to employees after this incident.

{¶92} For these reasons, I would find that the trial court properly allowed the punitive damages claim to go to the jury. I would further find that the award of attorney fees and costs was also proper.

{¶93} Accordingly, I would overrule the Nursing Home's first assignment of error.